UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 C 3166 |
| | ) | |
| MATTHEW ROSZAK, et al., | ) | Judge Ruben Castillo |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The Securities and Exchange Commission ("SEC") brought this civil action alleging

violations of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15

U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 against Defendants Matthew Roszak

("Roszak"), Darrin Edgecombe ("Edgecombe"), Douglas Jozwiak ("Jozwiak"), Trifon Beladakis

("Beladakis") and Mark Michel ("Michel"). (R. 1, Compl. ¶¶ 1-5.) Before the Court is

Defendant Michel's motion for summary judgment. (R. 54, Def. Michel's Mot. for Summ. J.)

For the following reasons, the motion is denied.

## RELEVANT FACTS[1]

### I.    Factual Background

Blue Rhino, Inc. ("Blue Rhino") is a North Carolina retail propane gas and tank

distribution company. (R. 68, Pl.'s Resp. to Def.'s Facts ¶¶ 9-10.)  During the period relevant to

---

[1]  These facts are derived from the parties' statements of facts and exhibits filed in
support thereof pursuant to Local Rule 56.1.  Unless otherwise indicated, the facts contained
herein are undisputed.

this suit, Blue Rhino's stock was traded on the Nasdaq National Market. (*Id.* ¶ 9.) On February

9, 2004, Blue Rhino announced its acquisition by Ferrellgas Partners, L.P. ("Ferrellgas"). (*Id.*)

The events underlying the SEC's complaint occurred in the month preceding Blue Rhino's

acquisition by Ferrellgas. (*See* R. 1, Compl. ¶¶ 1-5.)

Andrew Filipowski ("Filipowski"), a non-party to this litigation, was a member of Blue

Rhino's board of directors. (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 10; R. 86, Def.'s Resp. to Pl.'s

Add. Facts ¶ 2.) Aside from his involvement in Blue Rhino, Filipowski had numerous other

business ventures. (R. 68, Pl.'s Resp. to Def.'s Facts ¶¶ 11-12.) Defendant Roszak has been

employed by several of Filipowski's companies, although not Blue Rhino. (*Id.* ¶ 12.) Defendant

Roszak owned a significant interest in another of Filipowski's companies, Silkroad Equities, and

was its chief financial officer. (*Id.*) During his employment with Filipowski, Defendant Roszak

was personally involved in 12 to 20 mergers and acquisitions. (R. 68, Pl.'s Resp. to Def.'s Facts

¶ 37.) Throughout 2004, Filipowski and Defendant Roszak were in almost daily contact, whether

in person, by phone or by email. (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 13.)

## A.     Filipowski Allegedly Tips Defendant Roszak

On January 8, 2004, Filipowski and Defendant Roszak sat next to each other during a

plane trip from North Carolina to Chicago. (R. 86, Def.'s Resp. to Pl.'s Facts ¶¶ 5-6.) At this

time, Filipowski knew about Blue Rhino's proposed merger with Ferrellgas. (*Id.* ¶ 5.) The

parties dispute whether during the flight Filipowski gave Defendant Roszak information about

Blue Rhino's pending merger with Ferrellgas. (R. 68, Pl.'s Resp. to Def.'s Facts ¶¶ 14-16, 22.)

Approximately two hours after getting off the flight with Filipowski, Defendant Roszak

called his broker and placed an order for roughly $95,000 of Blue Rhino stock. (R. 86, Def.'s

Resp. to Pl.'s Facts ¶¶ 6-8.) This was almost four times larger than any stock purchase he had made in a single day during the last year. (R. 86, Def.'s Reply to Pl's Facts ¶ 8.) During the phone call Defendant Roszak's broker asked him, "[I]s there something here—do you know something you shouldn't"? (*Id.* ¶ 7.) According to his broker, Defendant Roszak responded, "[N]o, it's all on the up and up, it's my own research." (R. 56, Def.'s Facts, Ex. 9, Mahoney Invest. Test. at 26.)[2]

On January 28, 2004, Defendant Roszak emailed Filipowski about a matter related to one of Filipowski's other companies, and Filipowski responded that he was unable to deal with the matter right away because he was in "daily [Blue Rhino] meetings" and had "stuff that I need to concentrate on . . . ." (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 33; R. 56, Def.'s Facts, Ex. 6, Filipowski Invest. Test. at 132.) The parties dispute whether Defendant Roszak deduced from this email that the pending merger with Ferrellgas was imminent. (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 38.)

## B. Defendant Roszak Allegedly Tips Others

On January 29, the day after receiving the email from Filipowski, Defendant Roszak called four people, Defendant Jozwiak (his brother-in-law), Defendant Edgecombe (a long-time friend), Tom Roszak (his brother), and Brad Peters (another brother-in-law), all of whom

---

[2] Several of the witnesses, including Defendant Roszak's broker John Mahoney, provided investigative testimony before the SEC prior to the filing of this suit; this testimony is referred to as "Invest. Test." (*See* R. 56, Def.'s Facts, Ex. 9, Mahoney Invest. Test.). Other witnesses were deposed in the context of this litigation; the deposition transcripts are referred to as "Dep. Tr." (*See, e.g.,* R. 56, Def's Facts, Ex. 5, Edgecombe Dep. Tr.). Some witnesses, including Defendant Michel, gave both investigative testimony before the SEC and sat for a deposition in this case. (*See* R. 56, Def.'s Facts, Ex. 11, Michel Invest. Test.; *Id.*, Ex. 4, Michel Dep. Tr.).

subsequently purchased Blue Rhino stock. (R. 86, Def's Resp. to Pl.'s Facts ¶¶ 14-18.) The following morning, Defendant Jozwiak purchased $56,000 of Blue Rhino stock, the largest stock purchase he had made in the 11 years since opening his trading account. (R. 86, Def.'s Resp. to Pl.'s Add. Facts ¶ 22.) That same morning, Defendant Edgecombe bought $294,954 of Blue Rhino stock, his largest single-day purchase of stock in a year. (*Id.* ¶¶ 18, 25.) Within a few days of speaking with Defendant Roszak, Tom Roszak and Brad Peters (neither of whom are parties to this litigation) bought approximately $49,000 and $15,000 of Blue Rhino stock, respectively. (*Id.* ¶¶ 23-24.)

On February 4, 2004, a few days after making the above phone calls, Defendant Roszak visited his broker with a signed options form and inquired about buying Blue Rhino options. (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 40; R. 56, Def.'s Facts, Ex. 9, Mahoney Invest. Test. at 33-39.) His broker dissuaded him from purchasing the options, telling him the idea was "a little ridiculous." (R. 56, Def.'s Facts, Ex. 9, Mahoney Invest. Test. at 37.)

### C.    Defendant Edgecombe Allegedly Tips Others

After speaking with Defendant Roszak, Defendant Edgecombe in turn called four people: Mark Kastner (a business partner), Scott Edgecombe (his brother), and Defendants Beladakis and Michel (two long-time friends), all of whom subsequently purchased Blue Rhino stock. (*Id.* ¶¶ 25-29.) Kastner and Scott Edgecombe (neither of whom are parties to the litigation) each purchased approximately $13,000 in Blue Rhino stock within a few days of speaking to Edgecombe. (*Id.* ¶¶ 31-32.) Defendant Beladakis purchased $138,047 in Blue Rhino stock on January 30, almost four times as much as his next largest single-day purchase in the previous year. (*Id.* ¶ 29.)

4

Defendants Edgecombe and Michel have been friends since the early 1990s. (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 45.) They are in frequent contact and talk about stocks almost every time they speak; in the past, Defendant Edgecombe has given Defendant Michel stock recommendations. (*Id.* ¶¶ 46, 47.) On January 29, 2004, Defendant Edgecombe called Defendant Michel on the telephone around 8:42 p.m. (*Id.* ¶ 49.) The following morning, Defendant Michel, a registered representative at Wachovia Securities ("Wachovia"), bought Blue Rhino stock for his brother Brian and a few other customers. (*Id.* ¶¶ 6, 68, 72.) That same day, Defendant Michel sold 10,000 shares of his own stock in another company, Endocardial Solutions, which he had purchased three days earlier. (R. 86, Def.'s Resp. to Pl.'s Add. Facts ¶ 41.) On February 2 and February 3, Defendant Michel purchased a total of $89,460 in Blue Rhino stock for himself. (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 73; R. 86, Def.'s Resp. to Pl.'s Add. Facts ¶ 41.) Also on February 3, Defendant Michel submitted paperwork to his superiors requesting that he be permitted to borrow money from his brother Brian; he received approval for the loan a few days later and used the entirety of the $70,000 loan to purchase additional Blue Rhino stock. (R. 68, Pl.'s Resp. to Def.'s Facts ¶¶ 87-90.) It was against Wachovia policy to borrow money from a relative to buy stock.[3] (R. 86, Def.'s Resp. to Pl.'s Facts ¶¶ 42.) Over the course of six trading days, Defendant Michel purchased a total of $1.4 million worth of Blue Rhino for himself and approximately 40 of his customers. (*Id.* ¶ 47; R. 68, Pl.'s Resp. to Def.'s Facts ¶¶ 85, 101-08.)

---

[3] The record indicates that Wachovia policy does not prohibit all loans from family members, but does prohibit the use of such a loan to purchase stock: "Associates may not borrow from or lend money or securities to a client (except for loans to/from immediate family members for non-securities purposes and only with prior written Branch Office Manager/RBO Manager approval)." (R. 68-30, Pl.'s Facts, Ex. 23, Wachovia Associates Guide at 8.)

On February 9, 2004, Blue Rhino publicly announced its acquisition by Ferrellgas. (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 9.) That same day, the price of Blue Rhino stock rose approximately 20 percent to $16.74 per share. (R. 68-9, Pl.'s Facts, Ex. 6(A), Expert Report of Jeffry Davis ¶ 28.)

## II.    Procedural History

On June 8, 2006, the SEC filed this action against Defendants Roszak, Edgecombe, Jozwiak, Beladakis and Michel, alleging violations of Section 10(b) of the Exchange Act for trading on material, non-public information. (R. 1, Compl. ¶¶ 38-44.) Shortly after the complaint was filed, Defendants Roszak, Jozwiak, Beladakis and Edgecombe all waived service and consented to entry of judgment, without admitting or denying the allegations in the complaint. (R. 4-7.)

Final judgments awarding permanent injunctive relief to the SEC were thereafter entered against these Defendants. (R. 8-15.) Defendant Roszak was found liable for disgorgement of $23,230, representing profits gained by conduct alleged in the complaint, and was found jointly and severally liable for $93,004, representing profits gained by four tippees through conduct alleged in the complaint, plus prejudgment interest. (R. 9.) He was also ordered to pay a civil penalty of $116,234. (*Id.*) Defendant Jozwiak was found liable for $14,136, plus prejudgment interest, and was ordered to pay a civil penalty in this same amount. (R. 13.) Defendant Beladakis was found liable for $29,783 in profits, plus prejudgment interest, and was ordered to pay a civil penalty in this same amount. (R. 11.) Defendant Edgecombe was found liable for $65,017, representing profits gained by conduct alleged in the complaint, and was found jointly and severally liable for $70,794, representing profits gained by four tippees through conduct

alleged in the complaint, plus prejudgment interest. (R. 15.) He was ordered to pay a civil penalty of $104,930. (*Id.*)

Only the claims against Defendant Michel remain pending. He now moves for summary judgment. (R. 54, Def.'s Mot. for Summ. J.)

## LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party that is opposing summary judgment may not rest on mere allegations or denials in its pleadings, and instead must introduce evidence showing a genuine issue for trial. *Anderson*, 477 U.S. at 249; *Anders v. Waste Mgmt. of Wis., Inc.*, 463 F.3d 670, 675 (7th Cir. 2006).

In deciding a motion for summary judgment, the Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999). Summary judgment is not appropriate if there are disputed issues of fact remaining, or if the court must make "a choice of inferences" arising from undisputed facts. *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003). "The choice between reasonable inferences from facts is a function of a fact-finder, and when multiple reasonable

7

inferences exist on a genuine issue of material fact, summary judgment will not be appropriate."
*Id.* Further, the court cannot decide the credibility of witnesses or weigh the evidence in deciding
a summary judgment motion, as these are tasks for the trier of fact. *Keri v. Bd. of Trust. of*
*Purdue Univ.,* 458 F.3d 620, 627 (7th Cir. 2006).

Before turning to the merits, the Court must address two procedural matters. Both parties
have filed motions to strike evidence submitted by the other side in support of their respective
positions.

## DEFENDANT MICHEL'S MOTION TO STRIKE

Defendant Michel moves to strike the Affidavit of Jeffry Davis ("Davis Affidavit") and
his accompanying Expert Report ("Davis Report"), as well as the SEC's facts that rely on these
documents. (R. 79, Def.'s Mot. to Strike; R. 68, Pl.'s Add. Facts ¶¶ 37-38.) Defendant Michel
argues that Davis is not qualified as an expert and that his opinions are not appropriate expert
material. (R. 80, Def.'s Mem. in Supp. of Mot. to Strike at 1-2.)

The admissibility of expert testimony is governed by Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training or education, may testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702. For expert testimony to be admitted under Rule 702, the movant must
establish that the expert testimony is both reliable and would assist the trier of fact in
understanding the evidence or determining a fact at issue in the case. *See Daubert v. Merrell*

*Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993). The primary purpose of Rule 702 is to avoid confusing and unreliable expert testimony. *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1110 (N.D. Ill. 2005). Nevertheless, "the rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 128 F. Supp. 2d 1148, 1150 (N.D. Ill. 2001). Cross examination and the presentation of contrary evidence are the "traditional and appropriate means" of attacking expert testimony. *Loeffel*, 372 F. Supp.2d at 1110.

Defendant Michel first argues that Davis is not qualified as an expert because he has no background or experience in individual stock-buying patterns or energy sector investment. Davis's background and expertise are in the area of financial economics. (R. 95-2, Pl.'s Resp. to Def.'s Mot. to Strike, Ex. 1, Davis Aff. ¶ 2.) Financial economists "focus on the workings of the financial markets, including the stock market. In particular, financial economists study the behavior of stock prices and the factors and events that influence stock market behavior and prices." *(Id.)* Among his other opinions, Davis considered the innocent explanations offered by Defendant Michel for his stock purchases and concluded: that there was little basis for believing higher energy prices would cause Blue Rhino stock to go up; that Defendant Michel's trading with respect to two energy stocks prior to his purchases of Blue Rhino was inconsistent with behavior for creating long-term profit; and that a reasonable investor should not have expected Blue Rhino stock price to increase based on the approach of the summer season. (R. 68-9, Pl.'s Facts, Ex. 6(A), Davis Report ¶¶ 7-9, 18-22, 26-30.)

Defendant Michel's contentions notwithstanding, a review of Davis's *curriculum vitae,*

his two affidavits, and his deposition testimony reveal that he has significant experience and expertise in economics, insider trading, market behavior, the valuation of stocks, and the study of stock prices, as well as the factors and events that influence stock market behavior and prices. (*See* R. 95-2, Pl.'s Resp. to Def.'s Mot. to Strike, Ex. 1, Davis Supp'l Aff. at ¶¶ 3-11; R. 68, Pl.'s Facts, Ex. 6(A), Davis Aff. ¶¶ 2-4 & Ex. 6(A)(1), Davis *Curriculum Vitae*; R. 56, Def.'s Facts, Ex. 21, Davis Dep. Tr.) As the Seventh Circuit has directed, "a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *U.S. v. Parra*, 402 F.3d 752, 757 (7th Cir. 2005). Upon review of the evidence, the Court finds Davis qualified to render opinions on the above matters.

As for Davis's methodologies, Defendant Michel argues that the correlation coefficient, used by Davis to refute Defendant Michel's claim that he thought Blue Rhino stock would rise due to increasing energy costs, should not have been used for the purpose Davis used it. (R. 97, Def.'s Reply in Supp. of Mot. to Strike at 5.) A correlation coefficient is a "statistical measure of the strength of the linear relationship between two variables," in this case, the price of Blue Rhino stock and the price of four other energy companies in which Defendant Michel invested. (R. 68-9, Pl.'s Facts, Ex. 6(A), Davis Report ¶ 15.) In essence, Davis tracked the stock prices of each of four energy companies over a period of years, then correlated their price histories to that of Blue Rhino. (*Id.* ¶¶ 15-17.) He determined that the "Blue Rhino stock prices are not strongly positively correlated with the stock prices of any of the four energy companies," which he found

to be an indication that Blue Rhino was not an energy sector stock.[4] (*Id.* ¶ 17-18.)

Defendant Michel argues that the correlation coefficient is not a proper methodology for evaluating whether a group of stocks should be classified together, and indeed, our research has revealed no cases in which a party attempted to use a correlation coefficient analysis in precisely this manner. (*See* R. 97, Def.'s Reply in Supp. of Mot. to Strike at 5.) Nevertheless, the correlation coefficient is a well-accepted methodology for evaluating the relationship between two variables, and has been used by courts in the securities fraud context and a variety of other circumstances. *See In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341, 1348 (N.D. Cal. 1994) (discussing how coefficients are used in securities fraud cases to gauge the extent to which the price behavior of a security is attributable to alleged market manipulation); *see also NAACP v. City of Niagara Falls,* 65 F.3d 1002 (2d Cir. 1995) (in voting rights case, court considered expert testimony relying on correlation coefficient analysis to determine how voter support for a candidate varied with racial composition of election district); *Lewis v. City of Chicago*, No. 98 C 5596, 2005 WL 693618 (N.D. Ill. Mar. 22, 2005) (in Title VII case, court considered expert testimony relying on correlation coefficient analysis to consider relationship between test scores and job performance); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1041 (N.D. Miss. 1993) (as evidence of price-fixing conspiracy, court considered expert's opinion that used correlation coefficient analysis to demonstrate relationship between product prices and the prices of live fish).

Davis used the correlation coefficient methodology simply to map the prices of four

---

[4] Two variables are considered to be positively correlated when their values tend to go up or down together. (*See* R. 95-4, Pl.'s Resp. to Def.'s Mot. to Strike, Ex. 3, Federal Judicial Center, *Reference Manual on Scientific Evidence*, at 135-38 (2d ed. 2000) at 5.)

energy stocks over a specified period, along with Blue Rhino's stock prices over that same period, and compare them. He found a lack of correlation. While this is certainly not definitive evidence that Blue Rhino is not an energy sector stock, the lack of a correlation between the stock prices was one piece of Davis's analysis that led him to conclude there was little basis for believing that rising energy prices would boost the price of Blue Rhino stock.[5] (See 68-9, Pl.'s Facts, Ex. 6(A), Davis Report ¶¶ 5, 11-22.) Defendant Michel is free to offer contrary evidence or to argue that Davis's opinion is entitled to little weight. See Loeffel, 372 F. Supp. 2d at 1110. However, we do not find Defendant Michel's objections an appropriate basis to strike Davis's Report.

Defendant Michel also argues that Davis's opinions are unreliable because he "ignored key pieces of evidence" in reaching his conclusions. (R. 80, Def.'s Mem. in Supp. of Mot. to Strike at 6.) Defendant Michel complains that Davis did not review his trading account records for the months after January 2004, "which show a trading strategy that undermines the theory advanced through the Davis Affidavit." (Id. at 6-7.) We agree with the SEC that what Defendant Michel did with his stocks after his purchase of Blue Rhino was not a necessary component of Davis's analysis. (See R. 95, Pl.'s Resp. to Def.'s Mem. in Supp. of Mot. to Strike

---

[5] Among other factors, Davis also considered that Blue Rhino did not produce energy or refine energy products; instead the company provided a propane cylinder exchange program and sold products using propane. (R. 68-9, Pl.'s Facts, Ex. 6A, Davis Report ¶ 13.) Davis also considered Blue Rhino's own year-end report for 2003, which stated that rising energy prices could actually hurt its profit margins: "A substantial increase in propane prices could lead to decreased profit margins for us or our distributors and could impact our distributors' ability or, in the case of our independent distributors, desire, to service our retail accounts which could negatively affect our business." (Id. (quoting Blue Rhino Corp., Form 10-K for Fiscal Year Ending 7/31/2003 at 7).) Defendant Michel now acknowledges that he was mistaken in his belief that Blue Rhino was an energy sector stock. (R. 56, Def.'s Facts ¶ 69; Id., Ex. 1, Michel Aff. ¶ 12.)

at 11.) Indeed, Defendant Michel could have altered his post-Blue Rhino trading behavior in an effort to obscure the fact that he traded on insider information. Regardless, we need not reject Davis's Report solely because he did not address facts which Defendant Michel deems significant. As another court in this District recently observed, "Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006). Defendant Michel is free to attack the weight of Davis's testimony on cross-examination or to introduce his own evidence showing that Davis should have considered the post-January 2004 trading records in reaching his conclusions. We conclude that Davis's Report and accompanying materials satisfy the threshold reliability inquiry required by *Daubert*.

The second prong of the *Daubert* analysis is relevance; the inquiry is essentially whether the expert's testimony would be helpful to the trier of fact. *Daubert*, 509 U.S. at 589-91. Defendant Michel argues that the matters on which Davis offers opinions are easily understandable and do not require any expert testimony, and that Davis's sole purpose is to attack his credibility, which is strictly a matter for the trier of fact. (*See* R. 80, Def.'s Mem. in Supp. of Mot. to Strike at 1, 7-10.) Defendant Michel is correct that an expert cannot offer testimony about the credibility of witnesses, *see Richman*, 415 F. Supp. 2d at 941-42, but that is not the purpose of Davis's Report. In this case, the trier of fact will be required to weigh the innocent explanations offered by Defendant Michel against the circumstantial evidence of insider trading proffered by the SEC. Davis's Report gives much-needed context to Defendant Michel's explanations for his stock purchases, which presume a technical understanding of the stock market and trading strategies. The Report will assist the trier of fact in evaluating the plausibility

13

of the explanations offered by Defendant Michel. We thus find that Davis's Report satisfies the

threshold relevance inquiry required by *Daubert*. In conclusion, because Davis's Report and

accompanying materials are sufficiently reliable and relevant, Defendant Michel's motion to

strike is denied.

## SEC'S MOTION TO STRIKE

The SEC moves to strike the Affidavit of Michael Rhinehart ("Rhinehart Affidavit")

(R.57) and its accompanying exhibits, submitted by Defendant Michel in support of his motion

for summary judgment, as well as Defendant Michel's Exhibits 22-24, 28-31, and 34-35 (R. 56),

which are essentially duplicates of the documents attached to Rhinehart's Affidavit.[6] (R. 69,

Pl.'s Mot. to Strike.)

In his affidavit Rhinehart identifies himself as a "project assistant" at Foley & Lardner

LLP, the law firm representing Defendant Michel in this matter. (R. 57, Rhinehart Aff. ¶ 1.)

Attached to Rhinehart's affidavit are various charts, which purport to list "all of Mark Michel's

customers" who invested in Blue Rhino and six other companies: I-Stat Corp.; Newell

Rubbermaid, Inc.; Therasense, Inc.; I-Flow Corp.; Tumbleweed Communications; and Lexar

Media. (R. 57, Rhinehart Aff. ¶¶ 2-9.) For each company, Rhinehart's chart purports to provide

the name of every customer who invested in the stock, the number of customers who invested,

the amounts they invested, and the dates upon which they invested. (*Id.*) Rhinehart also

prepared a chart comparing the investments of Defendant Michel's customers who invested in

---

[6] Initially the SEC also moved to strike Defendant Michel's Exhibits 25-27 and 32. (R. 69, Pl.'s Mot. to Strike at 1). The parties have since resolved their disputes over these documents. (*See* R. 92, Def.'s Resp. to Pl.'s Mot. to Strike at 2-3 n.1; R. 93-2, Pl.'s Reply in Supp. of Mot. to Strike at 1.)

both Blue Rhino and Therasense, Inc. (*Id.* ¶¶ 10.) Finally, he prepared two charts which purport to reflect the investments of the customers of Tim Michel, Defendant Michel's cousin (a non-party), who is also a registered representative at Wachovia. (*Id.* ¶¶ 11-12; R. 68, Pl.'s Resp. to Def.'s Facts ¶ 7.) For each chart, Rhinehart attests, "I certify that it is accurate based upon my review of Wachovia records." (R. 57, Rhinehart Aff. ¶¶ 2-12.) Defendant Michel relies on these documents to demonstrate that his trading patterns with respect to these other stocks negate the inference that he traded on insider information in the case of Blue Rhino. (R. 55, Def.'s Mem. in Supp. of Mot. for Summ. J. at 11-12.)

The SEC argues that Rhinehart's affidavit and accompanying exhibits should be stricken because Defendant Michel did not identify Rhinehart as a witness in discovery and did not fully disclose the documents upon which he relied in compiling the charts. Defendant Michel does not dispute that he failed to list Rhinehart as a witness, and instead argues that he had no obligation to do so because Rhinehart simply "performed the menial task of transferring data from certain customer account records into a demonstrative exhibit." (R. 92, Def.'s Resp. to Pl.'s Mot. to Strike at 7.) He also argues that he does not anticipate calling Rhinehart as a witness at trial because he can testify himself about his customers, and further, that "this is just the type of exhibit we would have hoped could be admitted through stipulation of the parties." (*Id.*) We find this argument specious, for it is Rhinehart—who personally reviewed the underlying documents and could attest to their accuracy—who would be needed at trial to authenticate the charts. *See* Fed. R. Evid. 1006; *Needham v. White Lab., Inc.*, 639 F.2d 394, 403 (7th Cir. 1981). Whether Defendant Michel "hoped" the SEC would stipulate to the authenticity of the charts at trial is irrelevant. In discovery, the SEC requested information about Defendant Michel's trial

witnesses and/or other persons with knowledge, and Defendant Michel should have disclosed Rhinehart as a potential witness.

Additionally, Defendant Michel failed to turn over some of the documents that Rhinehart used to compile the charts. After the close of discovery, this failure to disclose was discovered by the SEC's witness, Kathleen Strandell, an accountant who painstakingly compared the charts attached to the Rhinehart affidavit with the Wachovia trading records that had been previously produced to the SEC. (R. 68-4, Pl.'s Facts, Strandell Aff. ¶¶ 23-25 & Ex. G, Charts.) She discovered discrepancies with respect to five of the six companies, with the most significant differences in the case of Therasense and Lexar Media. (*Id.*)

The customer trading records go to a key issue in this case, as Defendant Michel has asserted throughout this litigation that his investment patterns in other stocks negate any inference of insider trading with respect to Blue Rhino. The accuracy of these charts, which purport to reflect the universe of Defendant Michel's investments, is paramount. We reject Defendant Michel's suggestion that it is Wachovia, and not he, who should be faulted for failing to produce the requested documents, since there is evidence before us that Defendant Michel had these documents in his possession or, at a minimum, had access to them. (*See* R. 68-24, Pl.'s Facts, Ex. 18, Wells Submission on Behalf of Mark A. Michel at 4 n.1.) We find it irrelevant that he chose to have Wachovia produce these documents for his own convenience or other practical reasons. (*See* R. 92, Def.'s Resp. to Pl.'s Mot. to Strike at 3.) Defendant Michel bears the burden of complying with his obligations under the federal discovery rules, and since he is using these documents in his defense, he should have disclosed them (or ensured that they were disclosed) to the SEC. Additionally, as the SEC points out, there is an authenticity problem with

the charts. Federal Rule of Evidence 1006 allows parties to present summaries of large records, as long as they lay a proper foundation and make the records that are summarized available to the other party. Fed. R. Evid. 1006. The records Rhinehart is attempting to authenticate are never clearly identified in the affidavit, thus making them difficult to authenticate, and some were not made available to the SEC during discovery.

Under Rule 37, a party who fails to disclose evidence pursuant to Rule 26 without substantial justification is not permitted to use this evidence unless the failure to disclose was harmless. Fed. R. Civ. P. 37(c)(1). The sanction of exclusion is mandatory unless the party can show that its violation of Rule 26 was either justified or harmless. *Westefer v. Snyder*, 422 F.3d 570, 584 n. 21 (7th Cir. 2005). The determination of whether a failure is harmless or justified is left to the broad discretion of the district court. *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003). Here, we do not find any substantial justification for the failure to disclose, nor do we find the failure to disclose harmless. Defendant Michel makes much of the fact that he has since disclosed all of the underlying documents. (*See* R. 92, Def.'s Resp. to Pl.'s Mot. to Strike at 5 & n. 2.) However, as the SEC points out, this disclosure came after the close of discovery and after the SEC had already filed its response to the summary judgment motion and its Statement of Facts. The failure to list Rhinehart as a witness and disclose the documents he relied on in compiling the charts hampered the SEC's ability to fully analyze the customer trading records and question Rhinehart (as well as Defendant Michel) during discovery to determine if the records accurately supported Defendant Michel's contentions about his trading

17

patterns.[7] We find this particularly true with respect to Therasense, as Defendant Michel hinges

much of his argument on the similarities between his customers' investments in Therasense and

Blue Rhino. (*See* R. 55, Def.'s Mem. in Supp. of Mot. for Summ. J. at 11-12.) The Therasense

chart was one in which Strandell found significant differences. (*See* R. 68-4, Pl.'s Facts, Ex. 2,

Strandell Aff. ¶ 24 & Ex. G, Charts.) For these reasons, the Rhinehart Affidavit and

accompanying documents, along with Defendant Michel's Exhibits 22-24, 28-31, and 34-35 are

stricken.[8]

## LEGAL ANALYSIS

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection

with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Pursuant to its statutory authority, the SEC has promulgated Rule 10b-5, which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any
> means or instrumentality of interstate commerce, or of the mails or of any
> facility of any national securities exchange,
> (a) To employ any device scheme or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in light of the
> circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person, in connection with the

---

[7] The SEC asserts that it offered to withdraw its motion to strike if Defendant Michel
turned over all of the underlying documents and made Rhinehart available for a deposition or
interview to confirm what actions he took to develop the charts. (R. 93-2, Pl.'s Reply in Supp. of
Mot. to Strike at 1-2.) According to the SEC, Defendant Michel declined to make Rhinehart
available. (*Id.* at 2.)

[8] Although these documents have been stricken, there is other evidence in the record of
Defendant Michel's trading, including the Strandell Affidavit offered by the SEC. (*See* R. 68-4,
Pl.'s Facts, Strandell Aff. ¶¶ 12-25 & Ex. E-H.)

purchase or sale of any security.

17 C.F.R. § 240.10b-5. Trading on the basis of material, non-public information violates these sections when the trading occurs in connection with the breach of a fiduciary duty. *Dirks v. SEC*, 463 U.S. 646, 663 (1983).

There are two theories for establishing liability for insider trading under Rule 10b-5: (1) classical theory, which involves trading by an insider who possesses a fiduciary duty to the corporation, *see Dirks*, 463 U.S. at 660-61, and (2) misappropriation theory, which "extends the reach of Rule 10b-5 to outsiders who would not ordinarily be deemed fiduciaries of the corporate entities in whose stock they trade," *SEC v. Cherif*, 933 F.2d 403, 409 (7th Cir. 1991). Under the misappropriation theory, employed by the SEC in this case, a corporate "outsider" and his tippees can be held liable for the misappropriation of material, non-public information from its lawful possessor. *SEC v. Maio*, 51 F.3d 623, 630 (7th Cir. 1995). When an outsider misappropriates confidential information from his source of the information, he is considered to be breaching a fiduciary duty owed to the source in violation of Rule 10b-5. *Id.* For a tippee to be held liable under a misappropriation theory, the SEC must prove that he knew or should have known that the information given to him was improperly obtained. *Id.* at 634.

Defendant Michel argues that the SEC's case against him fails because: (1) the information allegedly misappropriated by Defendant Roszak was not material; (2) Defendant Michel did not know nor should he have known that any information given to him by Defendant Edgecombe was improperly obtained; and (3) Defendant Michel's investment in Blue Rhino was consistent with his pattern of investing in other stock, thereby negating any inference that he traded on insider information. (R. 55, Def.'s Mem. of Law at 2.)

### A.   Misappropriation of Material, Non-Public Information

Defendant Michel first argues that the SEC lacks evidence proving that Defendant

Roszak misappropriated material, non-public information from Filipowski in the first place. (*Id.*

at 3.) Although he packages this as a single argument, it appears he is actually advancing two

separate claims: first, that the SEC cannot prove Defendant Roszak misappropriated any

information at all, and second, that if misappropriation did occur, the information

misappropriated was not "material" for purposes of the Exchange Act. (*Id.* at 6-8.)

### 1.   Misappropriation

The gist of Defendant Michel's first argument is that the SEC's claim fails because there

is no direct evidence—such as a confession from Filipowski or Defendant Roszak—that any

misappropriation of information occurred. (*Id.* at 6-7.) Courts in this District and elsewhere

have held that the SEC is entitled to prove its case through circumstantial evidence. *See SEC v.*

*Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004) ("The SEC must prove violations of § 10(b) . . .

by a preponderance of the evidence, and may use direct or circumstantial evidence to do so.");

*SEC v. Singer*, 786 F. Supp. 1158, 1164-65 (S.D.N.Y. 1992) (plaintiff can establish a prima facie

case of insider trading without a direct confession from either the tipper or the tippee); *SEC v.*

*Van Wagner*, No. 97 C 6826, 1999 WL 691836, at *3-4 (N.D. Ill. Aug. 25, 1999)

("[C]ircumstantial evidence is sufficient to prove insider trading without a direct confession from

either the tippee or tipper."); *SEC v. Saul*, No. 90 C 2633, 1991 WL 133738 (N.D. Ill. July 12,

1991) (finding circumstantial evidence of insider trading sufficient to defeat summary judgment).

Indeed, as courts and commentators have recognized, direct evidence is rarely available in

insider trading cases, since usually the only witnesses to the exchange are the insider and the

alleged tippee, neither of whom are likely to admit to liability. *See SEC v. Peters*, 978 F.2d 1162, 1167 (10th Cir. 1992); *see also* 4 Bromberg & Lowenfels on Securities Fraud § 6:548 ("Proof of tipping will often be circumstantial for there will rarely be an objective record or disinterested observer of what was transmitted, and the alleged tipper and tippee will seldom admit that there was a tip.")

In this case, the circumstantial and undisputed evidence is that Defendant Roszak had access to insider information from Filipowski about the proposed merger with Ferrellgas. Shortly after his contact with Filipowski, he made a large purchase of Blue Rhino stock. After getting a subsequent email from Filipowski about the Blue Rhino board meetings, Defendant Roszak called four people, all of whom subsequently made substantial purchases of Blue Rhino stock. One of these people, Defendant Edgecombe, called four other people, including Defendant Michel, all of whom purchased Blue Rhino stock shortly thereafter. The day after speaking with Defendant Edgecombe, Defendant Michel made a substantial purchase of Blue Rhino stock for his brother and other customers. That same day Defendant Michel sold shares of stock in another company that he had recently purchased, and a few days after that he began purchasing a substantial amount of Blue Rhino stock for himself. He also borrowed money from his brother to invest additional amounts in Blue Rhino.

Based on these undisputed facts, the SEC asserts that an inference arises that Defendant Roszak was given material, non-public information about the pending merger, and that he traded on this information, also tipping off others, who likewise traded on the information in violation of the Exchange Act. Courts have found similar circumstantial evidence sufficient to create an inference that insider trading occurred. *See Ginsburg*, 362 F.3d at 1301 (pattern of trades made

by father and brother after calls from insider gave rise to inference that insider trading occurred and created fact issue for jury); *SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (defendant's access to insider information, coupled with pattern of phone calls and stock purchases, provided sufficient circumstantial evidence of insider trading); *Singer*, 786 F. Supp. at 1166 (suspicious timing of trades, contact between potential tippers and tippees, and implausible reasons for such trades provided adequate basis for inferring that tipping occurred); *Van Wagner*, 1999 WL 691836 at *3-4 (chairman's access to information, along with the suspicious trading of his friends and relatives, created inference of insider trading that precluded entry of summary judgment).

While this series of events may—as Defendant Michel argues—have an entirely innocent explanation, at this stage the Court must draw all inferences in the SEC's favor. *See King*, 166 F.3d at 890; *see also Von Wagner*, 1999 WL 691836, at *3-4 ("The innocent explanations offered by the defendants are limited by the inferences that must be drawn against them on their motions for summary judgment"). The Court concludes that the SEC has put forth sufficient circumstantial evidence to permit a reasonable inference that insider trading occurred. It will be for the trier of fact to decide whether to believe the version of events offered by the SEC or Defendant Michel. *See Ginsburg*, 362 F.3d at 1301 (jury must decide between competing "plausible" theories of the SEC and defendants); *Saul*, 1991 WL 133738, at *2 (in insider trading case, "the task of resolving the dispute between the parties as to what actually occurred is one which must be assigned to the jury").

Moreover, deciding which side to believe turns largely on the credibility of the witnesses. Although the Defendants have denied trading on insider information, the SEC points out that

they have offered equivocal testimony on numerous points, in some instances claiming a lack of memory about key conversations, and also offering conflicting or implausible explanations for their actions with respect to Blue Rhino stock purchases. For instance, Defendant Roszak denied telling Defendant Edgecombe about the merger, but testified that he did not recall whether he mentioned Filipowski, whether he told Defendant Edgecombe there were daily Blue Rhino board meetings, or whether he told Defendant Edgecombe that there was a major event about to happen at the company. (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 44; R. 56, Def.'s Facts, Ex. 7, Roszak Dep. Tr. at 154-55, 161-63.) Similarly, despite Defendant Michel's denials that Defendant Edgecombe told him anything about the pending merger, he could not recall many of the specifics about what Defendant Edgecombe said to him, including whether Defendant Edgecombe mentioned either Filipowski or Defendant Roszak during their conversation. (R. 56, Def.'s Facts, Ex. 4, Michel Dep. Tr. at 20-21, 27-31.) Defendant Edgecombe also denied telling Defendant Michel about the pending merger, but he acknowledged that he "could have" suggested to Defendant Michel that he consider buying Blue Rhino and could recall little else about their conversation. (R. 56, Def.'s Facts, Ex. 5, Edgecombe Dep. Tr. at 119-33.)

The Court cannot decide the credibility of witnesses or weigh competing evidence in the context of a summary judgment motion; it will be for the trier of fact to decide whether, and to what extent, to credit the testimony of these witnesses. *See Keri,* 458 F.3d at 627. However, based on the record, the trier of fact could reasonably decide to disbelieve Defendant Michel's version of events, and therefore summary judgment is not appropriate.

### 2. Materiality

Defendant Michel next argues that the information allegedly conveyed by Filipowski to

Defendant Roszak—specifically, that the Blue Rhino board was engaged in daily meetings—was of a very general nature and could not be considered "material" for purposes of the Exchange Act. (R. 55, Def.'s Mem. in Supp. of Mot. for Summ. J. at 6-7.) Information is considered material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to invest. *Basic, Inc., v. Levinson*, 485 U.S. 224, 231-32 (1988). This is a fact-specific inquiry. *Id.* Information about a potential merger, including information that meetings are occurring relative to a potential merger, is often considered material. *See Maio*, 51 F.3d at 628 & n.3; *U.S. v. Mylett*, 97 F.3d 663, 667 (2d Cir. 1996); *SEC v. Talbot*, 430 F.Supp. 2d 1029, 1039-40 (C.D. Cal. 2006.); *Singer*, 786 F. Supp. at 1172. Deciding whether information is material requires "delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc., v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Where reasonable minds could differ over whether information is material, the court should not grant summary judgment. *Id.*

As an initial matter, the Court cannot assume that the only information Filipowski gave to Defendant Roszak was that daily Blue Rhino board meetings were occurring, since this would require us to credit Defendants' version of events, which, as discussed above, requires a credibility determination that we cannot make at this stage. Even if the only information conveyed to Defendant Roszak was that daily board meetings were occurring (a matter that is undisputed), in light of Defendant Roszak's own familiarity with the merger process, we cannot conclude as a matter of law that this information was immaterial. The testimony of both Filipowski and Defendant Roszak suggests that the information about the board meetings was

24

significant. Defendant Roszak testified that although the daily board meetings could have been indicative of a number of corporate matters, "I thought if anything it would have been something good . . . ." (R. 56, Def.'s Facts, Ex. 8, Roszak Invest. Test. at 116.) He acknowledged that Filipowski's e-mail was a "catalyst" or "data point" that made him "think" about Blue Rhino stock; he offered equivocal testimony about whether the e-mail prompted him to recommend the stock to others: "I don't know if it prompted me. I think it could have been a factor maybe . . . ." (*Id.* at 121-23.) Filipowski testified that he regretted sending Defendant Roszak the e-mail because he had expected him not to act on the information it contained.[9] (R. 68, Pl.'s Resp. to Def.'s Facts ¶ 34; R. 56, Def.'s Facts, Ex. 6, Filipowski Invest. Test. at 133.) Defendant Roszak's calls to his relatives and friends shortly after receiving the e-mail from Filipowski, combined with their large and immediate purchases of Blue Rhino stock, also supports a reasonable inference that the information given to him was material. *See Maio*, 51 F.3d at 637 (trading patterns were themselves evidence of materiality); *SEC v. Shapiro*, 494 F.2d 1301, 1307 (2d Cir. 1974) (immediate trading upon receipt of inside information provides evidence of materiality); *Singer*, 786 F. Supp. 1172 (same).

In short, because there are factual disputes about precisely what information was given to Defendant Roszak, and because reasonable minds could differ over whether the information given to him was material, summary judgment is not appropriate.

---

[9] Filipowski testified: "I regret putting that email together in retrospect, but I presumed if he knew something like that he wouldn't do anything about it and so on the other hand it is what it is. I didn't thing [sic] it was confidential that the Board meetings were happening, particularly, but I shouldn't have done this. It's not my habit to do this normally." (R. 56, Def.'s Facts, Ex. 6, Filipowski Invest. Test. at 133.) Filipowski testified that he did not specifically instruct Defendant Roszak not to discuss the fact that Blue Rhino was having daily board meetings, but added, "My impression would be that he would know better" because "he's a pro." (*Id.* at 136.)

### B. Defendant Michel's Lack of Knowledge

Defendant Michel next argues that assuming insider information was misappropriated by Defendant Roszak and eventually communicated to him, there is no evidence that he knew or should have known that the information was improperly obtained. In support, he points to his and Defendant Edgecombe's testimony that Defendant Edgecombe never told him anything about the proposed merger. (R. 56, Def.'s Facts ¶¶ 50-52; *Id.*, Ex. 4, Michel Dep. Tr. at 20-30 & Ex. 5, Edgecombe Dep. Tr. at 133.) Their testimony was that Defendant Edgecombe told Defendant Michel only that he owned or was considering buying Blue Rhino stock and that he thought the stock was inexpensive. (R. 56, Def.'s Facts ¶ 51.) Based on this testimony, Defendant Michel argues that he had no reason to believe Defendant Edgecombe had any confidential information about Blue Rhino that had been misappropriated. (R. 55, Def.'s Mem. of Law at 8-10.)

The difficulty with this argument is that it requires the Court to credit Defendant Michel's account of events. As discussed above, whether to credit this testimony turns on the Defendants' credibility, a matter that cannot be determined by the Court in the context of a summary judgment motion. Nevertheless, Defendant Michel suggests that his version *must* prevail because the SEC has no direct evidence to the contrary. (*Id.* at 8-9.) Again, the SEC is not required to put forth direct evidence—such as a confession by Defendant Edgecombe—that Defendant Michel was given information about the pending merger. The difficulty inherent in proving the defendant's mental state in a securities fraud case prompted the Supreme Court to observe: "[T]he proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence. If anything, the difficulty of proving the defendant's state of mind

26

supports a lower standard of proof . . . . We have noted elsewhere that circumstantial evidence can be more than sufficient." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 & n. 30 (1983) (citations omitted); *see also Micheals v. Michaels*,767 F.2d 1185, 1199 (7th Cir. 1985) (in insider trading case, court concluded that scienter could be inferred from circumstantial evidence).

While an insider trading case may not be premised solely on "speculation" or "strained inferences," *see SEC v. Truong*, 98 F. Supp. 2d 1086, 1098 (N.D. Cal. 2000), this case does not fall in that category. Based on the undisputed facts—specifically, Defendant Roszak's access to insider information, the pattern of phone calls and the timing, number and volume of Blue Rhino stock purchases made by the Defendants—the inference that insider trading occurred is compelling. *See U.S. v. Larrabee*, 240 F.3d 18, 21 (1st Cir. 2001) ("opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades" creates a compelling inference of insider trading). Whether to accept Defendant's innocent version of events is a decision that must be left to the trier of fact. *SEC v. Adler*, 137 F.3d 1325, 1342 (11th Cir. 1998) (issue of whether to believe SEC's account or defendants' innocent explanations was for trier of fact); *Truong*, 98 F. Supp. 2d at 1101 (same).

## C.    Prior Trading Patterns

Defendant Michel's final argument is that he is entitled to summary judgment because "the purchases of Rhino by Michel, his family, and his customers were uniformly consistent with their past patterns of stock purchases." (R. 55, Def.'s Mem. in Supp. of Mot. for Summ. J. at 4.) As Defendant Michel points out, some courts have held that an inference of insider trading may

27

be negated if the defendant can show that the stock trades in question were consistent in timing and amount with past investments. *See Freeman v. Decio*, 584 F.2d 186, 197 & n. 4 (7th Cir. 1978); *SEC v. Heartland Advisors, Inc.*, No. 03-C-1427, 2006 WL 2547090 at \*3 (E.D. Wis. Aug. 31, 2006). As the SEC argues, however, in these cases the defendant was able to demonstrate a similar investment pattern with respect to the *same* corporate stock. *Freeman*, 584 F.2d at 197; *Heartland Advisors*, 2006 WL 2547090 at \*3-4. Here, Defendant Michel is attempting to show similarity between his Blue Rhino stock trades and his investment in *other* corporate stocks, which we find less probative than the type of evidence relied on by the courts in the above cases.

Moreover, many of the facts Defendant Michel points to in support of this argument are in dispute. (*See* R. 86, Def.'s Resp. to Pl.'s Add. Facts ¶¶ 33-39, 45-58; R. 68, Pl.'s Resp. to Def.'s Facts ¶¶ 57, 68, 71, 72.) The SEC contends that Defendant Michel's investment in Blue Rhino was different in almost every aspect from his prior investments. (R. 67, Pl.'s Resp. to Def.'s Mem. in Supp. of Mot. for Summ. J. at 11-13.) For instance, although Defendant Michel submitted an affidavit stating that he "believes" he regularly researched stocks on the same day that he purchased them, the SEC points to evidence that in several instances, Michel conducted research for days or months before buying a stock. (R. 68, Pl.'s Add. Facts ¶¶ 47-58; R. 86, Def.'s Resp. to Pl.'s Add. Facts ¶ 71.) Further, while Michel argues that his purchase of more than \$1.4 million of Blue Rhino stock was similar to other purchases he made for a number of clients, the SEC points to evidence showing that with other stocks it took Defendant Michel weeks (as opposed to six days) to invest the same amount on behalf of his customers, and in some instances he never invested that much money in the same company. (*Id.*) Additionally, in

28

the case of Blue Rhino, Defendant Michel made purchases for several customers each day, whereas in buying other stocks he was more cautious, waiting before making a second stock purchase. (*Id.*) The SEC also points out that for half of the households for which Defendant Michel bought Blue Rhino stock, the purchases represented their largest single-day purchase in months or even years. (R. 68, Pl.'s Add. Facts ¶ 45.) There is thus conflicting evidence about Defendant Michel's investment patterns.

Defendant Michel also argues that his own actions belie the SEC's claim that he was trading based on insider information because he "did not display a sense of urgency in his investments." (R. 84, Def.'s Reply in Supp. of Mot. for Summ. J. at 13.) He attaches significance to the fact that he did not buy any Blue Rhino stock for himself on January 30, the day he began buying it for his customers. (*Id.*) The Court cannot conclude as a matter of law that Defendant Michel's actions displayed a lack of urgency, given that on January 30, Defendant Michel sold Endocardial Solutions stock he had very recently purchased, and on February 2, he began purchasing Blue Rhino stock for himself, even borrowing a substantial amount of money from his brother to do so. There is evidence that Defendant Michel sold the Endocardial Solutions stocks at a loss; he argues that the sale was part of a short-term trading strategy which actually earned him a profit of $8,500 over eight days. (R. 84, Def.'s Reply in Supp. of Mot. for Summ. J. at 13 n.12.) He further argues that there is no evidence he sold the stock for the purpose of investing in Blue Rhino and that "it is just as likely he sold the stock, which was declining in value, to prevent further erosion of the profits that he had made on prior trades." (*Id.*) Again, Defendant Michel's explanations, and the credibility thereof, will be judged by the trier of fact.

Based on the record, and construing all reasonable inferences in the SEC's favor, we find the evidence falling short of establishing as a matter of law that the Blue Rhino purchases were so consistent with Defendant Michel's trading patterns as to negate any inference that insider trading occurred.

## CONCLUSION

For the foregoing reasons, Defendant Michel's motion for summary judgment (R. 54) is denied. Defendant Michel's motion to strike (R. 79) is denied. The SEC's motion to strike (R. 69) is granted, and the following documents are stricken: the Affidavit of Michael Rhinehart (R.57) and its accompanying exhibits, and Exhibits 22-24, 28-31, and 34-35 to Defendant Michel's Statement of Facts (R. 56).

The parties are directed to reevaluate their settlement positions in light of this ruling. A status hearing will be held in open court on **July 26, 2007** at **9:45 a.m.** to set a firm trial date. The parties shall file a joint status report on or before **July 25, 2007**.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** July 10, 2007