*M HN*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) No. 06 C 3166 |
| MARK MICHEL, et al., | ) ) Judge Ruben Castillo |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

The Securities and Exchange Commission ("SEC") brought this civil action alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 by Defendants Matthew Roszak ("Roszak"), Darrin Edgecombe ("Edgecombe"), Douglas Jozwiak ("Jozwiak"), Trifon Beladakis ("Beladakis") and Mark Michel ("Michel"). (R. 1, Compl. ¶¶ 1-5.) The same day the complaint was filed, Roszak, Jozwiak, Beladakis and Edgecombe all waived service and consented to entry of judgment, without admitting or denying the allegations in the complaint.[1] (R. 4-7.)

---

[1] Roszak was found liable for $23,230, representing profits gained by conduct alleged in the complaint, and was found jointly and severally liable for $93,004, representing profits gained by four tippees through conduct alleged in the complaint, plus prejudgment interest. (R. 9.) He was also ordered to pay a civil penalty of $116,234. (*Id.*) Jozwiak was found liable for $14,136, plus prejudgment interest, and was ordered to pay a civil penalty in this same amount. (R. 13.) Beladakis was found liable for $29,783 in profits, plus prejudgment interest, and was ordered to pay a civil penalty in this same amount. (R. 11.) Edgecombe was found liable for $65,017, representing profits gained by conduct alleged in the complaint, and was found jointly and severally liable for $70,794, representing profits gained by four tippees through conduct alleged in the complaint, plus prejudgment interest. (R. 15.) He was ordered to pay a civil penalty of $104,930. (*Id.*)

1

Michel was left as the sole remaining defendant. The Court denied Michel's motion for summary judgment, concluding that there were factual disputes that needed to be decided by the trier of fact. *SEC v. Roszak*, 495 F. Supp. 2d 875 (N.D. Ill. 2007). The claims against Michel thereafter proceeded to trial before this Court on October 1-5, 2007.

Michel, a registered representative at Wachovia Securities ("Wachovia"), invested approximately $1.4 million in Blue Rhino stock on behalf of himself and his clients over the course of six trading days, earning profits of $31,981 for himself and $234,470 for his customers. Michel asserts that he invested in Blue Rhino after receiving non-material information about the company from his friend, Edgecombe, which led him to conduct his usual research and ultimately decide to "build a position" in the company. He asserts that Blue Rhino's merger with another company within days of his trades, which caused the stock price to increase approximately 20 percent, was merely a fortuitous event. The SEC, however, asserts that Michel's profits were based on inside information about the merger that he received prior to executing the trades. Following a four-and-a-half day bench trial, this Court concludes that it is more likely than not the SEC's position is correct. After a careful evaluation of the all the relevant trial evidence, this Court sadly concludes that Michel abused his position of trust by repeatedly trading on material, non-public inside information. As a direct result of his illegal actions, this Court enters a total judgment of $346,188 against Michel plus an appropriate penalty.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial

2

witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

1.  This is a civil insider trading action brought pursuant to Sections 21(d) and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u-1, seeking injunctive and other relief, including disgorgement of ill-gotten gains. Subject-matter jurisdiction is based on Sections 21(e), 21A, and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e), 78u-1, and 78aa. (Stipulated Facts ¶ 1.) Personal jurisdiction over Michel and venue in the Eastern Division of the Northern District of Illinois are proper because Michel resides within this District, specifically, in Geneva, Illinois. (*Id.* ¶ 2.)

2.  Blue Rhino was, at all times relevant to this lawsuit, a North Carolina retail propane gas and tank distribution company traded on the Nasdaq national market. (Stipulated Facts ¶ 3.)

3.  On February 9, 2004, Blue Rhino publicly announced its acquisition by Ferrellgas Partners, L.P. ("Ferrellgas"). (Stipulated Facts ¶ 6.) On that date, Blue Rhino's share price rose approximately 20 percent to $16.74 a share. (Pl.'s Trial Ex. 30.)

4.  The purchase was completed in April 2004, and Blue Rhino is now a wholly-owned subsidiary of Ferrellgas. (Stipulated Facts ¶ 6.)

5.  Andrew Filipowski ("Filipowski"), a well-known Chicago businessman, was a member of Blue Rhino's board of directors during December 2003 and January and February

3

2004. (Stipulated Facts ¶ 4.)

6.    During this period, Filipowski's brother-in-law, Billy Prim ("Prim"), was Blue Rhino's chief executive officer. (Filipowski Invest. Test. at 114.)[2]

7.    Filipowski learned from Prim on December 20, 2003 that Ferrellgas was interested in purchasing Blue Rhino. (Filipowski Invest. Test. at 40-41.)

8.    By January 5, 2004, discussions between Blue Rhino and Ferrellgas had progressed to the point where the companies began due diligence. Filipowski was not present at the January 5 meeting during which the management teams of Ferrellgas and Blue Rhino began the due diligence process. (Stipulated Facts ¶ 5.) During this period, Filipowski knew that a special Blue Rhino committee was negotiating the merger with Ferrellgas, although he was not a member of this special committee. (Filipowski Invest. Test. at 58.)

9.    Aside from his involvement in Blue Rhino, Filipowski had numerous other business ventures. He was the founder, owner, chairman and CEO of Silkroad Equity, Inc. ("Silkroad"), a Chicago-based private internet company. (Stipulated Facts ¶ 7.)

10.    Prior to founding Silkroad, Filipowski owned Divine Interventures, Inc. ("Divine"), another internet venture capital company. (Stipulated Facts ¶ 8.)

11.    Roszak was Filipowski's business partner and had worked for him since about

_____

[2] Filipowski did not testify at trial; instead the transcript of his investigative testimony before the SEC on January 31, 2005, was designated part of the record. (R. 106, Pretrial Order, Ex. D, Deposition Designations.) The Court overrules Michel's objections to Filipowski's testimony appearing on pages 39-40, 49, 111, and 121, and also overrules the SEC's objections to the testimony appearing on pages 42-43. (*Id.* at 4-5.) However, the Court agrees that Michel's designations of pages 64 and 123 are incomplete under Fed. R. Civ. P. 32(a)(4) and Fed. R. Evid. 106, and has thus considered the additional testimony designated by the SEC as to these two pages. (*See id.* at 5.)

4

1999. Roszak began working for Filipowski at Divine, and eventually became head of mergers and acquisitions at Divine. In that position, he was personally involved in 12 to 20 mergers and acquisitions. (Stipulated Facts ¶ 9.)

12. After Divine filed for bankruptcy in 2003, Roszak helped Filipowski start Silkroad, where Roszak owned a significant interest and was its chief financial officer. (Stipulated Facts ¶ 10.)

13. Filipowski regularly disclosed confidential information to Roszak in the course of their discussions about business at Divine and Silkroad. (Filipowski Invest. Test. at 48-49; Trial Tr. at 61-66.)

14. In addition to consulting Filipowski on business matters, Roszak, on occasion, advised Filipowski on his personal finances as well. (Stipulated Facts ¶ 11.)

### The January 8, 2004 Flight

15. Roszak and Filipowski were together on business in North Carolina on January 7-8, 2004, and sat next to each other on a January 8 flight from Winston-Salem to Chicago. (Stipulated Facts ¶ 14.)

16. The SEC asserts that during this flight Roszak learned from Filipowski that Blue Rhino was in merger negotiations with Ferrellgas.

17. In his testimony, Filipowski did not expressly deny giving Roszak any information about the merger, but instead stated several times that he could not recall giving him any such information. For instance, he stated, "You know, I really tried to remember if there was any conversation on the topic and I just can't recall any, and I believe I'm naturally careful about that." (Filipowski Invest. Test. at 51.) At another point, Filipowski was asked whether he could

have told Roszak about the Blue Rhino merger negotiations during the January 8 flight, and he replied, "Not that I recall. I just—my impression is that I did not do that, but, you know . . . ." (Filipowski Invest. Test. at 86.) His testimony thereafter trails off. (*Id.*)

18. Roszak also could recall few details about the January 8 flight. (Trial Tr. at 80-86.) At trial, he nevertheless denied that he and Filipowski discussed Blue Rhino during the flight. (Trial Tr. at 82.) This was different from the testimony he provided at his deposition, wherein he testified "I don't recall" when asked whether he had talked to Filipowski about Blue Rhino during the flight. (*Id.*) At trial, he explained the conflict by stating, "I'm just telling you now that that's what I today recall is we didn't talk about it." (*Id.* at 83.)

19. There were other conflicts in Roszak's deposition and trial testimony. For instance, at his deposition Roszak acknowledged that he "occasionally" discussed Blue Rhino's business with Filipowski during the 2003-04 time period. (Trial Tr. at 68.) At trial, however, Roszak testified that although he and Filipowski had talked "generally" about Blue Rhino, such as the fact that Filipowski was a founder of the company, they never talked about Blue Rhino's "business." (*Id.* at 67-69.) At his deposition he answered "I don't recall" when asked whether anything was said on the January 8 flight that impacted his decision to buy Blue Rhino stock. (Trial Tr. at 83.) At trial, however, Roszak changed his testimony and answered, "No" in response to that same question. (Trial Tr. at 83.) When confronted with this discrepancy, Roszak answered, "I'm just telling you how I recollect it today." (Trial Tr. at 84.)

20. On January 8, 2004, the plane landed in Chicago at 9:12 a.m. Central Time, and Roszak picked up his car from the airport parking garage at 9:46 a.m. (Trial Tr. at 87; Pl. Trial Ex. 34.)

6

21.     Just two hours after getting off the flight, Roszak called his broker, John Mahoney ("Mahoney") at Merrill Lynch, to place an order to buy Blue Rhino stock. (Trial Tr. at 88-90, 128.) Mahoney was a college friend of Roszak's brother, Tom, and socializes with both members of the Roszak family. (Trial Tr. at 125-26.)

22.     Roszak had previously purchased approximately $7,178 worth of Blue Rhino stock in May 2003. (Stipulated Facts ¶ 15.) He had at least $12,137 in additional funds in his trading account as of May 2003 but did not use it to buy Blue Rhino stock. (Trial Tr. at 96-97; Pl.'s Trial Ex. 3.)

23.     During the call to Mahoney on January 8, 2004, Roszak asked how much cash he had in each of his three main trading accounts and inquired how much Blue Rhino stock he could buy with the cash. (Trial Tr. at 128-29.) He then directed Mahoney to purchase $95,694 in Blue Rhino stock. (Trial Tr. at 129; Pl.'s Trial Ex. 23.)

24.     Roszak's January 8 purchase order was so unusually large, and in Mahoney's view "aggressive," that it prompted Mahoney to ask, "Do you know something you shouldn't know?" (Trial Tr. at 130.) Roszak responded that his decision to buy was based on his own research. (Trial Tr. at 131, 143.)

25.     Roszak has provided various reasons for his Blue Rhino stock purchases. He testified that he thought the stock was "undervalued" when he first purchased it in May 2003, meaning that it should have been trading higher. (Trial Tr. at 76, 94.) However, the price of the stock fell between Roszak's first purchase on May 2003 and his second purchase on January 8, 2004. (Trial Tr. at 75-79, 94-95.)

26.     Roszak also testified that the purchase was not unusually large for him, but he was

unable to identify another instance where he made a purchase of that size prior to January 2004. (Trial Tr. at 92.) Roszak's account statements reflect that the $95,694 purchase was the largest single-day purchase he had made in the prior year; his second largest single-day purchase was $24,638 in November 2003. (Pl.'s Trial Ex. 1-3 & 23; Trial Tr. at 92.)

27.     Roszak also testified that he purchased Blue Rhino stock on January 8, 2004, because he "came into some additional cash and wanted to, for a while, to buy into Blue Rhino." (Trial Tr. at 93.) Upon questioning by SEC's counsel, however, Roszak admitted that he did not receive the money to which he was referring (from an initial public offering in another company) until several months after he purchased the Blue Rhino stock. (Trial Tr. at 93.)

28.     The Court finds that Roszak provided evasive testimony at trial and displayed a highly selective memory of the events underlying this case; he was able to remember facts that were helpful to him but was unable to recall numerous conversations and other facts that tended to show he was in possession of insider information. Indeed, during his testimony Roszak answered, "I don't recall" at least 45 times. (*See* Trial Tr. at 52-123.) As stated above, Roszak also provided testimony on key issues that conflicted with the testimony he gave at his deposition. Based on Roszak's conflicting testimony, his selective memory as to key events, his evasive answers to even straightforward questions, his demeanor on the stand, as well as the circumstantial evidence of his actions relative to Blue Rhino, the Court finds Roszak's denial that he obtained insider information from Filipowski lacking in credibility.

29.     Instead, the Court finds that on January 8, 2004, Roszak obtained information from Filipowski that Blue Rhino was in merger negotiations with Ferrellgas. The full extent of the information obtained by Roszak is not known because neither Roszak nor Filipowski

8

acknowledge that any tipping occurred.

## Filipowski's Email to Roszak

30. On January 28, 2004, Roszak sent an e-mail to Filipowski with a question related to his compensation at Silkroad. (Stipulated Facts ¶ 16.) At 10:53 p.m. that evening, Filipowski sent Roszak an e-mail in response, stating in part, "Give me a few days to flesh this out and get back to you. Got daily BR board meetings and stuff I need to concentrate on and then I will tackle this with you . . . ." (Stipulated Facts ¶ 17; Pl. Trial Ex. 35.) Daily "BR board meetings" meant daily Blue Rhino board meetings. (Filipowski Invest. Test. at 132.)

31. By January 28, 2004, Blue Rhino and Ferrellgas were engaged in serious merger discussions, and Filipowski was involved in daily Blue Rhino board meetings regarding the merger. (Filipowski Invest. Test. at 111-12, 133.)

32. Although Filipowski testified that he did not regard the information about the daily Blue Rhino board meetings as confidential, he stated that it was not his habit to give out such information, and he trusted Roszak to keep the information confidential. (Filipowski Invest. Test. at 133, 138.) He testified: "I regret putting that email together in retrospect, but I presumed if he knew something like that he wouldn't do anything about it and so on the other hand it is what it is. I didn't thing [sic] it was confidential that the Board meetings were happening, particularly, but I shouldn't have done this. It's not my habit to do this normally." (*Id.* at 133.) Although Filipowski testified that he could not recall having instructed Roszak not to discuss the fact that Blue Rhino was having daily board meetings, he stated, "My impression would be that he would know better." (*Id.* at 136.) Filipowski explained that he viewed Roszak as "a pro," meaning that "[h]e knows how to deal in publicly held situations and how to keep confidences."

9

(*Id.* at 136-37.)

33.     At trial, Roszak denied that he discerned from Filipowski's email that the merger with Ferrellgas was imminent. (Trial Tr. at 98-99.) He testified that, in his view, the daily board meetings could have been indicative of many things, including a positive or negative event for the company. However, he stated, "The fact that I owned stock, I was probably hoping it was a positive possibility." (Trial Tr. at 99.) Roszak testified that he could not recall whether the email caused him to consider buying more Blue Rhino stock or to call others to discuss the stock. (Trial Tr. at 100.) He admitted that the email from Filipowski was a "data point" or "catalyst" that caused him to think about Blue Rhino stock and his enthusiasm for it. (Trial Tr. at 100.)

34.     Based on the evidence, including Roszak's evasive testimony, his selective memory, his demeanor on the stand, and the circumstantial evidence of Roszak's actions, the Court does not find Roszak's denial credible, and instead finds that Roszak gleaned from Filipowski's email that the merger with Ferrellgas was imminent.

## Matthew Roszak Tips Others

35.     On the night of January 29, 2004, less than 24 hours after receiving Filipowski's email, Roszak made numerous phone calls to four people: Doug Jozwiak, his brother-in-law; Brad Peters, another brother-in-law; Tom Roszak, his brother; and Darrin Edgecombe, a long-time friend. All of these men subsequently made purchases of Blue Rhino stock.

36.     At 6:33 p.m. on January 29, Roszak dialed the phone number of Jozwiak. (Pl.'s Trial Ex. 15.) The call lasted a minute or less, and two minutes later, at 6:35 p.m., Roszak called Jozwiak again. That call also was for one minute or less. Two minutes after that, at 6:37 p.m., Roszak called Darrin Edgecombe, again for a minute or less. (Pl.'s Trial Ex. 15.)

10

37.     At 6:52 p.m., Jozwiak called Roszak, and the two talked for approximately seven minutes. (Pl.'s Trial Ex. 17.)

38.     Neither Roszak nor Jozwiak could recall if the they spoke about Blue Rhino that night, although neither was able to say unequivocally that they did not. (Trial Tr. at 100, 102, 108, 251-53.)

39.     Immediately after Roszak and Jozwiak hung up with each other at 6:59 p.m., they both made calls to others who later purchased Blue Rhino. Roszak called Peters, another brother-in-law, and spoke to him for three minutes. (Pl.'s Trial Ex. 15.)

40.     Jozwiak dialed the number of Edgecombe, a close friend, with whom he regularly discussed stocks. (Trial Tr. at 181-82, 253-54; Pl.'s Trial Ex. 17. ) The call lasted 16 seconds. (Pl.'s Trial Ex. 17.)

41.     Immediately after hanging up with Peters, Roszak dialed his brother Tom's home number for one minute at 7:02 p.m., Tom's cell number for one minute at 7:03 p.m., and Tom's home number again for one minute at 7:04 p.m. (Pl.'s Trial Ex. 15.)

42.     At 7:22 p.m., Tom called his brother back, and the two spoke for four minutes. (Pl.'s Trial Ex. 15 & 16; Trial Tr. at 166.) At 7:53 p.m., after hanging up with his brother, Tom attempted to reach his broker, Mahoney, at home and on his cell phone, with each call lasting approximately one minute. (Pl.'s Trial Ex. 16; Trial Tr. at 167-68.)

43.     Roszak called Edgecombe again at 6:37 p.m. (Pl.'s Trial Ex. 15, Trial Tr. at 189.) At 7:25 p.m., at the same time Roszak was talking to his brother Tom, Edgecombe called Roszak for one minute. At 7:26 p.m., immediately after hanging up with Tom, Roszak called Edgecombe again and the two spoke for four minutes. (Pl.'s Trial Ex. 15, Trial Tr. at 189.)

11

44. Neither Edgecombe nor Roszak could remember any details of their telephone calls on January 29, 2004. (Trial Tr. at 100, 102, 108, 188-92.) When asked whether he spoke with Roszak about Blue Rhino during those phone calls, Edgecombe answered, "I don't know." (Trial Tr. at 189.) Both men deny that Roszak passed any information to Edgecombe about the Blue Rhino merger negotiations or the daily board meetings. However, given their selective memory about these events, their evasive testimony, their demeanor on the stand, and the circumstantial evidence regarding their actions relative to Blue Rhino, the Court does not find their denials credible. Instead, the Court finds that Roszak tipped Edgecombe that Blue Rhino was engaged in merger negotiations and that daily board meetings were occurring, indicating that the merger appeared to be imminent. The full extent of the tip is not known since neither Roszak nor Edgecombe admit that any tipping occurred.

45. Although Roszak testified that he could not recall whether he gave Edgecombe, Jozwiak, Brad Peters, or his brother Tom any information about the proposed merger or the daily board meetings at Blue Rhino, he acknowledged, "I must have said something because, in learning through these proceedings what happened the next day, they must have thought something." (Trial Tr. at 122.)

46. Roszak did not buy any additional Blue Rhino stock following the January 28-29 email exchange with Filipowski. (Stipulated Facts ¶ 18.) However, Roszak did discuss the possibility of buying Blue Rhino options with his broker, Mahoney. (Trial Tr. at 132-36; Pl.'s Trial Ex. 32.) Sometime in the week following January 29, Roszak visited Mahoney with an options form, filled out and signed, and asked specifically about buying Blue Rhino options. (Trial Tr. at 135-136; Pl.'s Trial Ex. 32.) According to Mahoney, Roszak had never before

12

bought any options through him. (Trial Tr. at 134.) Mahoney did not think buying Blue Rhino options was a good investment and dissuaded Roszak from doing so. (Trial Tr. at 135-36.)

47.    Roszak began selling his Blue Rhino stock on February 10, the day after the merger announcement, and within a week had sold all of the stock, earning total profits of approximately $23,000. (Pl.'s Trial Ex. 22.)

## Darrin Edgecombe Tips Others

48.    On the heels of the phone calls from Roszak, Edgecombe had several phone conversations the night of January 29 with his friend Jozwiak. (Pl.'s Trial Ex. 18; Trial Tr. at 206-10, 240.) He also called three other people that same night: Mark Kastner ("Kastner"), a friend and business associate (a non-party to this litigation); Beladakis, another friend and business associate; and Michel, a long-time friend. (Pl.'s Trial Ex. 18; Trial Tr. at 206-22.) Some time in the next few days, Edgecombe also called his brother Scott[3] (a non-party to this litigation) in Atlanta, Georgia. (Scott Edgecombe's Dep. Tr. at 44-46.) Each of these men subsequently purchased Blue Rhino stock.

49.    During the 2003-04 period, Edgecombe and Jozwiak talked on the telephone once or twice a week. (Trial Tr. at 181.) However, on January 29 and 30, they spoke at least eleven times: seven phone calls on the night of January 29, and four more phone calls the morning of

---

[3] Scott Edgecombe did not testify as a witness at trial, but the transcript of his deposition taken December 13, 2006, was made part of the record. (Trial Tr. at 408; R. 106, Pretrial Order, Ex D, Deposition Designations.) The Court overrules Michel's objections to the testimony on pages 42-55 of Scott Edgecombe's deposition, and the SEC's objection to the testimony on page 60. (R. 106, Pretrial Order, Ex. D at 5-6.) However, the Court agrees with the SEC that Michel's designations of pages 39 and 56 are incomplete under Fed. R. Civ. P. 32(a)(4) and Fed. R. Evid. 106, and has thus considered the additional testimony designated by the SEC. (*See id.* at 6.)

January 30. (Pl.'s Trial Ex. 18; Trial Tr. at 206-10.) One of the phone calls from Jozwiak to Edgecombe occurred at 8:42 a.m. on January 30, just as Jozwiak was making a purchase of Blue Rhino stock. (Trial Tr. at 255-57; Pl.'s Trial Ex. 54; Pl.'s Trial Ex. 17.)

50. Edgecombe stated that he "could have" spoken to Jozwiak about Blue Rhino during these calls. (Trial Tr. at 209.) When asked whether he had suggested to Jozwiak during these calls that Jozwiak buy Blue Rhino stock, Edgecombe responded, "I don't know." (Trial Tr. at 209.) He could recall few details about their phone calls, but denied telling Jozwiak that Blue Rhino was in merger negotiations or having daily board meetings. (Trial Tr. at 209-10.)

51. That same evening, Edgecombe called Trifon Beladakis, a business colleague and friend of eight to ten years. (Pl.'s Trial Ex. 18; Trial Tr. at 210.) Beladakis was also an active day trader, and the two often talked about stocks. (Trial Tr. at 211-12.) Edgecombe first called Beladakis at 7:32 p.m. on January 29, just two minutes after he hung up with Roszak. The two spoke for three minutes. (Pl.'s Trial Ex. 18; Trial Tr. at 213.) Within fifteen minutes, Beladakis had called Edgecombe back three times, with the third call lasting ten minutes. (Pl.'s Trial Ex. 20.)

52. Edgecombe admitted that he and Beladakis "could have" discussed Blue Rhino during those calls, but he claimed not to remember any of the details. (Trial Tr. at 214.) Beladakis testified that although he could not specifically recall, it was "very, very possible" that the two spoke about Blue Rhino during their phone conversations. (Trial Tr. at 271-72.) Beladakis denied that Edgecombe told him about the merger, daily board meetings, or a "major event" about to occur at Blue Rhino. (Trial Tr. at 279.)

53. On January 30, Edgecombe telephoned another business colleague and friend,

14

Mark Kastner, five times between 8:25 a.m. and 12:53 p.m. (Pl.'s Trial Ex. 18; Trial Tr. at 216-17, 297-98.) The two often talked about stocks. (Trial Tr. at 216.) Neither Kastner nor Edgecombe could recall the details of their phone conversations, but Edgecombe admitted that they "could have" discussed Blue Rhino. (Trial Tr. at 216, 298-99.)

54.     At some point in the next few days, Edgecombe called his brother Scott in Atlanta and discussed Blue Rhino with him. (Trial Tr. at 217-18.) The call occurred some time before February 3, when Scott bought Blue Rhino. (Trial Tr. at 218; Scott Edgecombe Dep. Tr. at 44-46.) Edgecombe and his brother talked on the phone approximately once a week, and during this period they occasionally talked about stocks and investing. (Scott Edgecombe Dep. Tr. at 18-20.) Scott testified that his brother had recommended that he consider buying Blue Rhino stock, but could not recall many other details about their conversation. (*Id.* at 44-52.) He testified that he did not recall his brother telling him the company was engaged in merger negotiations. (*Id.* at 51.)

## Darrin Edgecombe's Blue Rhino Purchase

55.     On January 30, the day following his phone conversation with Roszak, Edgecombe bought $294,954 of Blue Rhino stock. (Pl.'s Trial Ex. 7, 22.) This amount represented his largest single-day purchase in at least a year by more than $100,000. (Pl.'s Trial Ex. 23.) In one of his accounts, Edgecombe had not bought or sold any stock in more than a year. (Pl.'s Trial Ex. 6, 7 & 13.)

56.     Edgecombe sold his Blue Rhino stock on February 9, the same day the merger was announced, and earned profits of $65,017. (Pl.'s Trial Ex. 22.)

57.     To finance the purchase of Blue Rhino stock in that account, Edgecombe sold a

15

stock that had more than tripled in value in the previous year. (Trial Tr. at 191-92; Pl.'s Trial Ex. 7.)

58.     Edgecombe's profession is in thermoplastic resin sales, but he is also an active trader. (Stipulated Facts ¶ 25.) Edgecombe has been an avid trader since the mid-1990s, and during the 2003-2004 time period he spent anywhere from one to two hours a day researching, buying and selling stocks. (Trial Tr. at 175, 223-26, 456.)

59.     In the 2003-04 period, Edgecombe knew of Filipowski and knew that Roszak had worked for Filipowski at Divine. (Trial Tr. at 180.)

60.     Edgecombe has provided various reasons for purchasing Blue Rhino stock on January 30, 2004. During his investigative testimony before the SEC, Edgecombe testified that he bought Blue Rhino stock because it was trading close to a 52-week low in price. (Trial Tr. at 194-95, 200.) In reality, however, the price at which Edgecombe bought Blue Rhino on January 30, 2004—between $13.21 and $13.75 a share—was approximately 40 percent higher than the stock's 52-week low of $9.32 a share. (Pl.'s Trial Ex. 46, Davis Report at ¶ 24; Pl.'s Trial Ex. 30.) At trial, Edgecombe changed his testimony to state that he had done some additional research to figure out why he bought the stock, and that he had probably been referring to a low relative to the stock's two or three year trading history. (Trial Tr. at 196.)

61.     Edgecombe also claimed that he bought Blue Rhino because he thought the stock would increase in anticipation of the barbeque season in the spring and summer months. (Trial Tr. at 203.) To him, that meant the stock price would go up in February and March. (*Id.*) While Edgecombe claimed that he would have reviewed the trading history of Blue Rhino in February and March of 2003 to see if his theory was correct, Blue Rhino's stock price actually declined

during February and March of 2003. (Trial Tr. at 204-05; Pl.'s Trial Ex. 46, Davis Report at ¶ 29; Trial Tr. at 579-80.) At trial, the SEC introduced the expert testimony of Jeffry L. Davis, a financial economist with 25 years of experience in the workings of financial markets.[4] (Trial Tr. at 551-55; Pl.'s Trial Ex. 46, Davis Report, Ex. 1.) According to Davis, Edgecombe's stated belief that Blue Rhino's stock price would increase in anticipation of a known event, barbeque season, is contrary to conventional market behavior, in which known events are already factored into a stock's price. (Pl.'s Trial Ex. 46, Davis Report at ¶¶ 26-29; Trial Tr. at 576-80.)

62.     Edgecombe acknowledged that January 2004 was not the first time someone had given him the idea of buying Blue Rhino stock. (Trial Tr. at 184.) He testified that he first heard of the company as an investment opportunity in 2002 or 2003 from Roszak or Jozwiak. (Trial Tr. at 184-85.) Edgecombe gave conflicting and evasive testimony about whether he performed any research on Blue Rhino at that time. (Trial Tr. at 184-86.)

63.     Based on all the evidence, including the credible testimony of the SEC's expert, the Court does not find credible Edgecombe's innocent explanations for buying Blue Rhino stock on January 30, 2004.

### Doug Jozwiak's Blue Rhino Purchase

64.     At approximately 8:43 a.m. on January 30, while on the phone with Edgecombe, Jozwiak bought $56,000 of Blue Rhino stock. (Trial Tr. at 255-57; Pl.'s Trial Ex. 17, 54.) This was the largest purchase of stock by Jozwiak since he began investing in 1993. (Trial Tr. at 248; Pl.'s Trial Ex. 23.) Jozwiak sold other stock to help finance the purchase, and the rest of the money came from Jozwiak's savings account. (Trial Tr. at 249-50.)

---

[4] Michel did not offer his own expert at trial.

65.     Although this was the largest stock purchase Jozwiak had ever made, he could not recall why he purchased the stock except that Edgecombe had said he "liked the stock." (Trial Tr. at 247-48.) When asked whether Edgecombe gave him any reasons for liking the stock, Jozwiak responded, "No, not really." (Trial Tr. at 248.) He claimed not to remember anything Edgecombe had said to him about Blue Rhino. (Trial. Tr. at 249.) Jozwiak also could not recall whether he talked to Matt Roszak about Blue Rhino before investing but admitted that he "could have." (Trial Tr. at 249.)

66.     During this period, Jozwiak knew of Filipowski and believed he was Roszak's "boss." (Trial Tr. at 244.)

67.     Jozwiak sold his Blue Rhino stock on February 17, 2004, and earned profits of $14,139. (Pl.'s Trial Ex. 22.)

### Tom Roszak's Blue Rhino Purchase

68.     Tom Roszak testified that he and his brother talked about Blue Rhino on the night of January 29, although he could recall few details of their conversation. (Trial Tr. at 159.) Tom did recall that his brother was "more enthusiastic" than he had been in the past about Blue Rhino as an investment. (Trial Tr. at 160.) Tom knew that his brother worked for Filipowski, and that Filipowski was on the Blue Rhino board of directors. (Trial Tr. at 150-54, 161.) Tom denied that his brother told him the company was in merger discussions or having daily board meetings. (Trial Tr. at 161.) This was somewhat different from his testimony at his August 2005 deposition, wherein he testified that he did not remember whether his brother told him about any daily board meetings. (Trial Tr. at 161-62.)

69.     On the day following his phone conversation with his brother, Tom bought

$49,500 of Blue Rhino stock. (Pl.'s Trial Ex. 4.) This was his largest single day purchase of stock. (Pl.'s Trial Ex. 23.) According to Tom's broker, Mahoney, this purchase was unusually large and not "very characteristic of the way Tom would invest in his account at Merrill Lynch." (Trial Tr. at 140.)

70.     Tom Roszak sold his Blue Rhino stock on February 13, 2004, and made a profit of approximately $10,700. (Pl.'s Trial Ex. 4 & 22; Trial Tr. at 169-70.)

## Brad Peters' Blue Rhino Purchases

71.     Brad Peters was not called as a witness in this case. On January 30, Peters bought $1,188 of Blue Rhino stock. (Pl.'s Trial Ex. 5.) Two business days later, on February 3, Peters bought $14,721 more of Blue Rhino stock. (Pl.'s Trial Ex. 5.) This was his largest single day purchase of stock. (Pl.'s Trial Ex. 23.) In the previous year, none of Peters' stock purchases had exceeded $1,000. (Pl.'s Trial Ex. 5.)

72.     On February 11, 2004, two days after the merger announcement, Peters sold his Blue Rhino stock and earned a profit of approximately $3,000. (Pl.'s Trial Ex. 5 & 22.)

## Trifon Beladakis' Blue Rhino Purchase

73.     On January 30, 2004, Beladakis bought $138,047 of Blue Rhino, almost four times as much as the next largest single-day purchase of stock he had made in the previous 13 months. (Pl.'s Trial Ex. 10 & 23.) Beladakis testified that he bought the stock because of Edgecombe, although he could not recall specific details of their conversations. (Trial Tr. at 264.)

74.     Beladakis sold his Blue Rhino stock on February 9, 2004, the same day as the merger announcement, and earned a profit of approximately $29,000. (Pl.'s Trial Ex. 10 & 22.)

19

### Mark Kastner's Blue Rhino Purchase

75.     Mark Kastner purchased $13,280 of Blue Rhino stock on January 30, which was three times larger than any single-day purchase he had ever made. (Trial Tr. at 287-96; Pl.'s Trial Ex. 11, 12 & 23.) Kastner was an inexperienced investor, having only begun investing in October 2003, and testified that investing in stocks made him nervous. (Trial Tr. at 287; Pl.'s Trial Ex. 11 & 12.)

76.     At trial, Kastner could not recall a single reason why he bought Blue Rhino stock on January 30, nor did he know whether he had conducted any research before buying the stock. (Trial Tr. at 295-99.) When asked whether the phone calls from Edgecombe led him to consider buying Blue Rhino stock, Kastner answered, "I couldn't answer that. I have no idea." (Trial Tr. at 298.) When asked whether Edgecombe said anything to him about Blue Rhino being involved in merger discussions, Kastner responded, "He may have. I don't remember." (Trial Tr. at 299.)

77.     Kastner sold his shares of Blue Rhino on February 9, 2004, the same day the merger was announced, and earned profits of approximately $3,400. (Trial Tr. at 300; Pl.'s Trial Ex. 11 & 22.)

### Scott Edgecombe's Blue Rhino Purchase

78.     On February 3, Scott Edgecombe bought $13,992 of Blue Rhino based on his brother's recommendation. (Scott Edgecombe Dep. Tr. at 43-44; Pl.'s Trial Ex. 13.) This was the first activity of any kind in Scott's account since January 1, 2003, and his largest single-day purchase ever. (Scott Edgecombe Dep. Tr. at 42-44; Pl.'s Trial Ex. 23.) To buy Blue Rhino, Scott sold the only stock he owned, Coca-Cola, and also transferred $8,636 from his bank account. (Scott Edgecombe Dep. Tr. at 42-44.)

20

79.    Scott Edgecombe sold his Blue Rhino stock on February 9, the same day the merger was announced, and earned profits of approximately $2,600. (*Id.* at 58-59; Pl.'s Trial Ex. 22.)

## The Evidence As To Mark Michel

80.    Michel has been employed by Wachovia Securities or one of its predecessors as a registered representative since 1993. (Stipulated Facts ¶ 19.) In October 2002, Michel moved his practice to Wachovia's Dekalb, Illinois office, where his uncle Paul Michel and his cousin Tim Michel already worked. (*Id.* ¶ 20.) To date, Wachovia continues to employ Michel in the Dekalb office. (*Id.* ¶ 21.) Michel received his Series 7 and 63 securities licenses in 1993 and has held both licenses continuously since then. (*Id.* ¶ 22.) During the 2003-04 time period, Michel held accounts for around 300 to 325 client households. (Trial Tr. at 432.) Approximately 40 to 50 of those clients wanted occasional or regular stock ideas from Michel. (Trial Tr. at 432.)

81.    To date, Michel has never been sanctioned or punished by a regulator for a securities violation. (Trial Tr. at 426.)

82.    Michel and Edgecombe have been friends since the early 1990's. They see each other 15 to 20 times a year and talk on the phone at least that many times a year. (Stipulated Facts ¶ 24.) During the period relevant to this lawsuit, Michel and Edgecombe talked about stocks almost every time they spoke, and discussed what stocks they were trading and what stocks they believed were good buys. (*Id.* ¶ 26.) Edgecombe has given Michel suggestions or recommendations of stocks to buy, and Michel has asked Edgecombe for his opinions of different sectors. (*Id.* ¶ 27.)

83.    On January 29, 2004, Edgecombe called Michel at 8:42 p.m. and the two had a

17-minute telephone conversation. (Stipulated Facts ¶ 29; Pl.'s Trial Ex. 18.) Phone records show that Michel had called Edgecombe that afternoon shortly before leaving his office. (Def.'s Trial Ex. 22.) Michel could not recall the reason he called Edgecombe that day, but he guessed that it was "[p]robably to talk about the stock market." (Trial Tr. at 512.)

84.     Phone records show that Michel also called Edgecombe three times on January 30. (Def.'s Trial Ex. 22.)

85.     Michel acknowledged that he and Edgecombe discussed Blue Rhino on the night of January 29, but claimed not to recall most of the details of the conversation. (Trial Tr. at 315.) For instance, he did not recall whether Edgecombe mentioned Matt Roszak's name during the phone call. (*Id.*) He also could not recall whether Edgecombe mentioned Filipowski's name, although Michel acknowledged that he had heard of Filipowski. (Trial Tr. at 316.) Michel denied that Edgecombe told him anything about the pending merger or that daily board meetings were occurring at Blue Rhino. (Trial Tr. at 316-17.)

86.     Michel did recall that during their conversation on January 29, Edgecombe told him Blue Rhino stock was inexpensive and that he had purchased the stock or was going to purchase it. (Stipulated Facts ¶ 30.)

87.     Michel claimed Edgecombe mentioned another stock, U.S. Gypsum, as a possible investment in the same conversation. (*Id.*; Trial Tr. at 316-18.) Michel did not buy any U.S. Gypsum stock, although he claims to have conducted some research on the stock on January 30 or sometime thereafter. (Trial Tr. at 318-19.) Edgecombe's account statements indicate that he did not purchase U.S. Gypsum until nearly three months after this conversation, on April 26, 2004. (Trial Tr. at 318; Pl.'s Trial Ex. 7.)

88.     Immediately upon hanging up with Edgecombe, at 8:59 p.m., Michel telephoned his brother Brian and talked to him for eleven minutes. (Trial Tr. at 319-20.) The evidence shows that Brian is often one of the first of Michel's clients to invest in a new stock. (Def.'s Trial Ex. 8; Trial Tr. at 444.) At trial, Michel testified that he did not speak to Brian about Blue Rhino during this conversation. (Trial Tr. at 319.) This was different from the testimony he gave at his June 2005 deposition, wherein he testified that he did not recall what was discussed during his phone call with Brian that night. (Trial Tr. at 319-20.)

89.     On the stand, Michel—like many of the witnesses in this case—displayed a selective memory; he was able to recall certain conversations and other details that were helpful to him, but he professed to have very little memory of other conversations and details indicating he was in possession of insider information.

90.     Based on his selective memory, his evasive and in some instances conflicting testimony, his demeanor on the stand, and the circumstantial evidence regarding his actions with respect to Blue Rhino, the Court does not find credible Michel's denial that Edgecombe conveyed non-public information to him during their phone conversations. Instead, the Court finds that Edgecombe tipped Michel that Blue Rhino was in merger negotiations and that the merger appeared to be imminent due to the daily board meetings that were occurring. The full extent of the tip is not known since neither Edgecombe nor Michel acknowledge that any tipping occurred.

## Michel's Blue Rhino Purchases

91.     The following morning, January 30, Michel arrived at work between 7:30 a.m. and 7:45 a.m. and began researching Blue Rhino. (Stipulated Facts ¶ 31.) He made his first

purchase of Blue Rhino, for his brother Brian, at 9:09 a.m. that morning. (*Id.* ¶ 32.)

92.     Michel did not spend the entire 90 minutes researching Blue Rhino. (Trial Tr. at 321.) Approximately 20 percent of that time he was looking at market activity and reading through the news. (Trial Tr. at 321-22.) Michel also spent somewhere between 10 and 25 minutes looking for a report in Barron's that he recalled seeing a few months earlier which gave Blue Rhino a positive rating. (Trial Tr. at 329-32; Pl.'s Trial Ex. 37.)

93.     Michel had seen the Barron's report in September 2003 giving Blue Rhino a positive rating, but at that time he did not buy, research or consider buying Blue Rhino, even though he was buying other stocks around that time. (Trial Tr. at 314, 514.) He nevertheless remembered seeing the article and was able to locate it in his office on January 30. (Trial Tr. at 314.)

94.     Michel produced 14 pages of research he claims to have reviewed regarding Blue Rhino prior to making his first purchase. (Pl.'s Trial Ex. 37.) The research consists of Standard & Poor's reports, Yahoo Finance articles, Dow Jones Newswire graphs, Dow Jones Newswire research, TheStreet.com articles, and Dorsey, Wright & Associates charts. One of the Standard & Poor's reports included a chart showing that the majority of analysts rated Blue Rhino as a "buy." (Pl.'s Trial Ex. 37.)

95.     The Yahoo Finance article listed the names of Blue Rhino's insiders, including Filipowski, and listed the amount of stock that each insider owned. (Pl.'s Trial Ex. 37, SEC A 00346.)

96.     Of the research Michel claims to have reviewed, only four pages have time stamps on them of prior to 9:09 a.m. on January 30, 2004. Two documents are dated January 30, but are

24

time-stamped 11:47 a.m. Eastern Time. Two more documents are date-stamped January 30, 2004, but do not have a time-stamp. One document is dated January 31, 2004. The remaining documents do not have a date or time stamp. (Pl.'s Trial Ex. 37; Trial Tr. at 324-35.)

97.     Michel testified that he specifically recalled looking at all of the documents before he made his first purchase of Blue Rhino (Trial Tr. at 325.) The Court is skeptical of this testimony given Michel's inability to recall his conversations with Edgecombe the evening before. The Court finds the evidence equivocal as to whether Michel reviewed all of these documents before deciding to invest in Blue Rhino. However, even assuming Michel did print all of these documents prior to making his first purchase of Blue Rhino, given all of the evidence in this case, the Court finds it more likely that he compiled this research to cover up the fact that he was trading on the basis of insider information.

98.     On January 30, Michel bought approximately $457,000 of Blue Rhino shares for nine customers in four households, including his brother Brian. (Pl.'s Trial Ex. 24.) Over the course of six trading days, Michel purchased a total of more than $1.4 million of Blue Rhino stock for himself and 47 customers, including his mother and other relatives. (Stipulated Facts ¶ 32.)

99.     Michel did not buy Blue Rhino for himself on January 30, which was a Friday. On that date, however, he sold 10,000 shares of Endocardial Solutions stock that he had bought three days earlier. (Pl.'s Trial Ex. 14; Trial Tr. at 353.) The shares were sold at a loss of $5,500. (Trial Tr. at 353.) Considering Michel's total trades in Endocardial Solutions over the course of the prior week, however, he made an overall profit of $8,522 from investing in the stock. (Trial Tr. at 414; Def.'s Trial Ex. 16.) After selling the Endocardial Solutions shares, as of January 30,

25

Michel had a cash balance in one of his accounts of $90,588. (Def.'s Trial Ex. 16.)

100. The following Monday and Tuesday, February 2 and 3, Michel bought $89,460 of Blue Rhino stock for himself: $70,000 on Monday and $19,460 on Tuesday. (Pl.'s Trial Ex. 24; Trial Tr. at 352.)

101. Also on February 2, Michel bought $70,000 of Blue Rhino stock for his mother, Charlette. (Stipulated Facts ¶ 34.) This represented the largest single-day purchase of stock he had made for her from January 1, 2002 through that date. (Pl.'s Trial Ex. 26.) Charlette had an additional $70,000 available in her trading account at that time that was not used to buy Blue Rhino. (Trial Tr. at 480.)

102. On Tuesday, February 3, and Wednesday, February 4, Michel arranged to borrow $70,000 from his brother Brian for the express purpose of making a third Blue Rhino purchase. (Stipulated Facts ¶ 33; Pl.'s Trial Ex. 39.) Michel received approval to borrow money from Brian and the funds were transferred into his account on February 4. (Pl.'s Trial Ex. 39; Trial Tr. at 355.) On February 6, Michel used the loan to purchase another $69,500 of Blue Rhino stock. (Pl.'s Trial Ex. 24; Trial Tr. at 352, 354-55.)

103. Michel had borrowed money from his brother Brian on three previous occasions to buy stock, but prior to the February 2004 loan the most he had borrowed was $10,000. (Trial Tr. at 356.) The next most recent loan had occurred in July 1999 for $5,281. (Trial Tr. at 355-56.) In October 2004, following the events giving rise to this lawsuit, Michel borrowed $46,000 from Brian to purchase an unrelated stock. (Trial Tr. at 356, 538-39.)

104. It was against Wachovia policy for a broker to receive a loan from any client, even a relative, to buy stock. (Pl.'s Trial Ex. 40; Trial Tr. at 359-60, 535-36.) Michel testified that he

was aware of the general policy prohibiting loans from clients, but was not aware that the rule prohibited loans from immediate family members. (Trial Tr. at 360.) However, Michel acknowledged that each year he was required to read and attest to understanding the rules contained in the Wachovia associates' guide. (Trial Tr. at 359.) When Michel sought and obtained his branch manager's signature on the form authorizing the transfer of funds from his brother's account to his, he did not tell him the purpose of the loan. (Trial Tr. at 358, 537.)

105. Michel's manager, Jim O'Brien, testified that he did not know the purpose of the loan when he approved it, but he also was not aware of the policy prohibiting loans from immediate family members for securities purposes. (Trial Tr. at 537.)

106. In total, Michel bought $1,414,105 of Blue Rhino stock for himself and 47 customers over the course of six trading days, more than double the dollar value of any stock he had purchased during the first six trading days of buying in his then eleven years as a broker. (Stipulated Facts ¶ 32; Pl.'s Trial Ex. 24 & 27.) For nearly half of the 47 customers, the Blue Rhino purchase represented the largest purchase of stock they had made in a single day in the previous few months to two years. (Pl.'s Trial Ex. 26.)

107. These purchases also represented a significant percentage of the total national volume in Blue Rhino. Between January 30 and February 6, Michel's purchases represented as high as 14 percent of the national volume, and averaged 11 percent for the six days. (Pl.'s Trial Ex. 28.)

108. Within days of the merger announcement on February 9, Michel and the vast majority of his relatives and customers sold their stock. (Pl.'s Trial Ex. 25.) Michel sold his stock on February 9, the same day as the merger announcement, and made $31,981 in profits.

27

(Pl.'s Trial Ex. 25; Trial Tr. at 361-62.) Michel's customers made a total of $234,470 in profits, which included $12,656 for his mother and $36,167 for his brother. (Pl.'s Trial Ex. 25.)

109. Wachovia received $30,080 in commissions from Michel's purchases and sales of Blue Rhino, $11,430 of which Michel kept. (Pl.'s Trial Ex. 25; Trial Tr. at 363.)

110. In 2003, Michel earned $96,000 in pre-tax income. (Trial Tr. at 363.) After taxes and other deductions, his take-home pay was around $55,000. (Trial Tr. at 364.) Michel is the sole provider for his wife and two children. (Trial Tr. at 364.) As of January 2004, Michel was carrying a credit card balance of approximately $9,977. (Trial Tr. at 367.)

## Michel's Explanations for His Blue Rhino Purchases

111. During the course of the SEC's investigation, Michel has provided various reasons for his Blue Rhino purchases. He initially stated that he bought Blue Rhino stock because he believed it would benefit from rising energy prices. (Trial Tr. at 337; Pl.'s Trial Ex. 46, Davis Report ¶ 7). Michel explained that he was making an energy "play" and believed Blue Rhino was an energy company like El Paso, TransGlobe Energy, Tesoro and Chevron, other stocks he bought around the same time as Blue Rhino. (Pl.'s Trial Ex. 46, Davis Report ¶ 7.)

112. The Court finds that there was little basis for Michel, an experienced stockbroker, to have believed in January 2004 that Blue Rhino was an energy stock that would benefit from rising energy costs.

113. Blue Rhino's own public reports filed around this time—which were available as of January 30, 2004 on a publicly accessible website—indicated that higher propane prices could adversely impact the company. The 10-Q Report for the fiscal quarter ending October 31, 2003, stated: "If propane costs rise, our gross margins and results of operations would be negatively

28

affected due to additional costs on unhedged volumes . . . that we may not be able to recover fully through an increase in our price to retailers." (Pl.'s Trial Ex. 38; Trial Tr. at 337-38.) Blue Rhino's annual report, filed on a Form 10-K with the Commission and dated July 31, 2003, made a similar statement: "A substantial increase in propane prices could lead to decreased profit margins for us or our distributors and could impact our distributors' ability or, in the case of our independent distributors, desire, to service our retail accounts which could negatively affect our business." (Pl.'s Trial Ex. 46, Davis Report ¶ 13.)

114.    Michel testified that he did not review these documents before deciding whether to buy Blue Rhino stock. (Trial Tr. at 337-38.) However, the Court must consider this statement in light of all the evidence, including Michel's lack of credibility on the stand. The Court notes that Michel has acknowledged looking at these type of corporate filings before investing in another stock. (Trial Tr. at 369-70.)

115.    Even assuming Michel did not look at Blue Rhino's public filings, there is other evidence indicating Blue Rhino was not in the energy sector. For instance, one of the documents Michel claims to have reviewed in conducting his research of Blue Rhino on January 30—the Standard & Poor report—lists Blue Rhino as being in the "consumer discretionary" sector, not the energy sector. (Pl.'s Trial Ex. 37, SEC A 00343.) At trial, Michel testified that he saw Standard & Poor's categorization but did not put much weight on it. (Trial Tr. at 472, 518.) The Court finds this testimony inconsistent with Michel's statements that he consistently relied on Standard & Poor reports when making investment decisions. (*See* Trial Tr. at 433-36.)

116.    Further, the companies identified by Michel as also being part of his energy play—El Paso, TransGlobe Energy, Tesoro and Chevron—were major energy producers, refiners

and transporters. (Pl.'s Ex. 46, Davis Report ¶¶ 11-14.) In contrast, Blue Rhino provided a propane cylinder exchange service and sold products that used propane. Blue Rhino did not produce energy or refine energy products. Its transportation of energy products consisted of moving propane cylinders from refilling sites to retail outlets. (*Id.* ¶ 13.)

117.     Additionally, a comparison of the stock prices of Blue Rhino and El Paso, TransGlobe Energy, Tesoro and Chevron, conducted by the SEC's expert, Jeffry Davis, showed that Blue Rhino's stock did not perform in the same manner as the energy companies identified by Michel as being part of his energy "play." Were Blue Rhino operating in the same sector of the economy as these four energy companies, Davis opined, the movement of its stock should bear some resemblance to the movement of the stock prices of the four energy companies. However, when Davis performed a correlation coefficient analysis on the five stocks, he found Blue Rhino's stock showed no correlation to the other stocks. (Pl.'s Trial Ex. 46, Davis Report ¶¶ 14-17.) Although this is not conclusive evidence that Blue Rhino is not an energy stock, Davis's testimony undermines Michel's assertion that he believed Blue Rhino was in the same sector as the other energy stocks he identified.

118.     Michel now acknowledges that he was mistaken in his belief that Blue Rhino was an energy sector stock. (Trial Tr. at 339-40.) The Court finds it unlikely that a stockbroker with more than 10 years of experience would make a mistake of that magnitude in assessing a stock in which he invested $1.4 million of his clients' money.

119.     Michel also claimed that he purchased Blue Rhino stock because he thought it was inexpensive. (Trial Tr. at 461-62; Pl.'s Trial Ex. 46, Davis Report ¶ 7.) When Michel bought Blue Rhino stock, however, it was well above its 52-week low and, by that criterion, it

was not inexpensive. (Pl.'s Trial Ex. 46, Davis Report ¶ 24.) At trial, Michel explained that by "inexpensive" he meant the stock was trading lower than it should be given the company's price-earnings ratio. (Trial Tr. at 461-62.) While this assertion has not been contradicted by the SEC[5] and is not inherently incredible, it must be considered within the context of all the evidence in this case, including the fact that Michel became aware of Blue Rhino as an investment back in September 2003 but chose not to invest in the stock; in the later part of September 2003, Blue Rhino stock was trading at around $11 or $12 a share, less than what Michel purchased it for in late January and early February 2004 (around $13.90 a share). (Pl.'s Trial Ex. 30.)

120.    During the SEC's investigation, Michel also claimed that he thought the price of Blue Rhino would rise with the approach of "mosquito season." (Pl.'s Trial Ex. 46, Davis Report ¶ 9.) To the extent Michel believed that Blue Rhino stock prices would increase with the approach of the summer months (which coincides with "mosquito season"), this assertion conflicts with conventional market wisdom, in which a known event is already factored into a stock's price. (Pl.'s Trial Ex. 46, Davis Report at ¶¶ 26-29; Trial Tr. at 576-80.) Michel did not explain his statement about "mosquito season" at trial, however, there is other evidence in the record indicating that Blue Rhino introduced a new mosquito abatement product in the third quarter of fiscal year 2003. (Pl.'s Trial Ex. 37; Trial Tr. at 601-02.) The SEC's expert, Davis, testified that regardless of the precise meaning of Michel's reference to "mosquito season," Blue Rhino stock prices would not be expected to rise during the summer months because this is a known event that is already factored into the stock's price. (Trial Tr. at 603.)

---

[5] The SEC's expert acknowledged that "different people have different ways of defining what they mean by inexpensive," and as a result he did not have specific knowledge of what Michel meant when he used that term. (Trial Tr. at 595.)

31

121.   Based on the evidence, including Michel's selective memory, his conflicting testimony, his demeanor on the stand, and the circumstantial evidence of his actions relative to Blue Rhino, the Court does not find credible Michel's innocent explanations for purchasing Blue Rhino stock.

## Tim Michel's Blue Rhino Purchases

122.   Michel points to evidence of Blue Rhino purchases made by his cousin Tim Michel ("Tim"), also a stockbroker at Wachovia's Dekalb office, to negate the inference that he traded on insider information. The Court finds this evidence of limited relevance since Tim's actions, and his motivations therefore, are not at issue in this suit. Additionally, Tim's actions do not negate the core evidence in this case regarding the mosaic of phone calls that occurred among the Defendants on January 29 and 30, nor do they negate the evasive testimony provided by these Defendants, including Michel, as to what they discussed during those phone calls. Nevertheless, the Court has given due consideration to the following facts in rendering a decision in this case.

123.   Tim Michel and Mark Michel frequently exchanged investment ideas and often invested in the same stocks. (Trial Tr. at 431, 617.) On Monday, February 2, Michel told Tim about Blue Rhino stock and provided him with some research he had done, which included a document wherein Michel had handwritten a calculation of the company's price-earnings ratio. (Trial Tr. at 617-25; Def.'s Trial Ex. 11.) After Michel provided Tim with his research, Tim also looked into the company as an investment. (Trial Tr. at 618.) Tim bought $140,000 in Rhino for himself the same day he learned about the Blue Rhino stock idea. (Def.'s Trial Ex. 10.) He began buying it for his customers the following day, and purchased a total of approximately $1.3 million for himself and his customers over the course of five trading days. (Def.'s Trial Ex. 10.)

124.     When Tim called his clients to discuss Blue Rhino, he explained to them why he

thought it was a good investment and what the potential upside and downside may be.  (Trial Tr.

at 620.)  An example of what Tim told his customers about Blue Rhino can be found in an email

Tim wrote to one of his customers on February 4, 2004, a few days before the merger was

announced:

> We have begun to build a position in a stock called Blue Rhino
> (RINO).  The company provides a propane cylinder exchange
> service at retial [sic] locations across the US.  Over the past 5+
> years, the company has acquired various distributors in what was an
> extremely fragmented market.  They have now grown the company
> into a situation where the earnings will continue to grow based upon
> their dominance and ability to acquire and improve margins/pricing.
> This is not a 'glamour' stock, but we do think it could trade toward
> the $20 area over the next 12 months.  We do not believe the
> downside to be more than $11-12 per share.  Let me know if you are
> interested in purchasing some stock in your joint account.

(Def.'s Trial Ex. 1; *see also* Def.'s Trial Ex. 2-3.)

## Mark Michel's Other Investments

125.     Michel also argues that his Blue Rhino purchases were so similar to other stock

purchases he made in 2002, 2003, 2004, and 2005 as to negate the inference that his Blue Rhino

stock purchases were based on insider information.

126.     As is discussed below, while there are certain similarities between Michel's

trading in Blue Rhino and his trading in the other stocks he points to—Newell Rubbermaid, I-

Stat, Therasense, Electroglas, I-Flow, Tumbleweed Communications ("Tumbleweed"), and

Lexar Media—there are important differences as well.

### *Newell Rubbermaid*

127.     Michel invested one client in Newell Rubbermaid in October 2000 and in June

2003 began to build a position in the company with respect to a number of client households. (Def.'s Trial Ex. 7.)

128. Michel invested $198,543 of his own money in Newell Rubbermaid, which was more than he invested in Blue Rhino. (Def.'s Trial Ex. 6.)

129. Michel stated that he threw out his research on Newell Rubbermaid, but he acknowledged that he researched it anywhere from a couple of days to a week before discussing the stock with his cousin Tim. (Trial Tr. at 379-80.)

130. After buying Newell Rubbermaid for one customer on June 6, 2003, Michel waited five weeks before buying it again on July 14. (Trial Tr. at 382.) He then waited another 17 days before beginning to buy it for a number of clients on July 31. (Trial Tr. at 382.) He continued to buy the stock for almost a year, until October 2004, and purchased a total of $672,561 for 33 client households. (Def.'s Trial Ex. 7.)

131. Based on the evidence, the Court finds that Michel researched the stock longer before purchasing it, purchased the stock more slowly and over a longer period, and invested less than the amount invested in Blue Rhino.

### *I-Stat*

132. Michel began buying I-Stat in December 2002, prior to the events giving rise to this lawsuit. (Def.'s Trial Ex. 7.)

133. Michel began researching I-Stat on October 21, 2002, six weeks before he made his first purchase for a customer. (Trial Tr. at 368; Pl.'s Trial Ex. 41.) He continued doing research on the company thereafter and also contacted the company to ask that an investor packet be mailed to him. (Trial Tr. at 368-72.) The documents Michel reviewed before investing in

34

I-Stat included a Standard & Poor's report, Dow Jones Newswire graphs and articles, a Yahoo Finance Article, a Dorsey, Wright & Associates charts, as well as various materials sent to him by the company, including corporate SEC filings. (Trial Tr. at 368-78; Def.'s Trial Ex. 14.)

134. After purchasing I-Stat for one customer in December 2002, Michel waited until January 16, 2003, to purchase the stock for himself and his brother Brian. (Pl.'s Trial Ex. 27; Trial Tr. at 378.) He then waited another five days before buying it for one more customer, six days for the next customer, 14 days for the next purchase, and 11 days for the next purchase. (Pl.'s Trial Ex. 27; Trial Tr. at 378-79.) Michel continued buying I-Stat through July 2003, and over the course of those eight months he bought $821,072 of I-Stat stock for 42 customer households. (Trial Tr. at 378-79; Def.'s Trial Ex. 7.)

135. Michel purchased $57,114 in I-Stat stock for himself, less than he invested in Blue Rhino. (Def.'s Trial Ex. 6.)

136. Based on the evidence, the Court finds that Michel researched I-Stat for a longer period before purchasing, purchased the stock more slowly and over a longer period, and invested less than the amount invested in Blue Rhino.

### *Therasense*

137. Michel began investing in Therasense in October 2003. Michel's investment in Therasense most closely resembles his actions with respect to Blue Rhino.

138. Michel began researching Therasense in October 2003 after receiving a tip from a client about a product made by Therasense that his daughter was using. (Trial Tr. at 383-84.) The research Michel conducted on Therasense included Yahoo Finance articles, Dow Jones Newswire graphs, Dow Jones Newswire articles, and Dorsey, Wright & Associates charts.

35

(Def.'s Trial Ex. 12.) Several of these documents bear a date stamp of October 10, 2003. One document is dated October 13, 2003, and the final document, a chart, is dated January 8, 2004. (Def.'s Trial Ex. 12.)

139.    At trial, Michel testified that he began his research of Therasense on October 10, 2003, the same day he purchased the stock for his brother Brian. (Trial Tr. at 383.) At his deposition, however, he testified that he may have begun researching Therasense a few days prior to his first purchase of the stock. (Trial Tr. at 383-84.) At trial Michel testified that he now specifically recalled investing in Therasense the same day he learned about the company from his client. (Trial Tr. at 384.) The Court must place this testimony in context, however, given Michel's inability to recall conversations and events relative to Blue Rhino, which occurred after his investment in Therasense.

140.    In light of Michel's selective memory and the conflict in the testimony, the evidence is equivocal as to whether Michel began researching Therasense on October 10 or some earlier date. However, even assuming he did begin his research that day, there are other material differences in his investments in Therasense.

141.    In the first six trading days of investing in Therasense, Michel bought $455,459 of the stock, less than one-third of the amount of Blue Rhino he bought in the same time. (Pl.'s Trial Ex. 27; Trial Tr. at 447.)

142.    Further, in the middle of Michel's Therasense purchases, on October 22, 2003, Therasense released a strong third-quarter earnings report indicating that total revenues were up 49 percent from the same period in 2002. (Pl.'s Trial Ex. 50; Trial Tr. at 386.) Michel bought more Therasense for his customers after that date, and acknowledged that the strong earnings

36

report played a major role in his decision to purchase more Therasense stock. (Trial Tr. at 387.) There was no such earnings report in the case of Blue Rhino.

143. On January 13, 2004, Therasense announced that it was being acquired by Abbott Laboratories, causing the stock to immediately increase in value. (Trial Tr. 448.) Shortly thereafter, Michel sold his customers' Therasense shares, liquidating their positions into cash. (Trial Tr. at 448.) By mid-January 2004, Michel's customers who had invested about $2 million in Therasense now had over $3 million available for reinvestment. (Trial Tr. at 448.)

144. Although there are certain similarities in the investments, the Court finds that Michel researched the stock for a longer period, and he purchased the stock more slowly and over a longer period than he did Blue Rhino. There is also credible, objective evidence (the earnings report) that would explain Michel's large purchases of Therasense stock.

### *Electroglas*

145. Michel began researching Electroglas in January 2004, shortly before he invested in Blue Rhino, based on a tip from his cousin Tim. (Trial Tr. at 453; Def.'s Trial Ex. 15.)

146. Michel purchased Electroglas on January 22, 2004, for two or three clients. (Trial Tr. at 454-55.)

147. Michel produced eight pages of research he claims to have reviewed before investing in Electroglas. (Def.'s Trial Ex. 15.) Only one of the eight pages he produced bears a date stamp indicating that it was printed on January 22, 2004. (Def.'s Trial Ex. 15.) The other pages do not contain a printed date stamp, but within the documents themselves two are dated January 16, 2004, three are dated January 17, 2004, and the last is dated January 22, 2004. (Def.'s Trial Ex. 15.)

37

148. At trial, Michel testified that he reviewed all of these documents on January 22, the same day he made his first purchase of Electroglas. (Trial Tr. at 387.) However, upon questioning by SEC's counsel, Michel admitted that he had no specific memory of reviewing the documents on January 22, but instead was making an assumption that he did so because his normal routine was to print out all his research at the same time. (Trial Tr. at 387-89.)

149. The evidence is thus equivocal as to whether Michel began researching Electroglas the same day he purchased it. Even assuming he did begin purchasing the stock the same day he began his research, he purchased the stock for only a few households, as opposed to the 40 households that he invested in Blue Rhino.

### *I-Flow*

150. Michel began investing in I-Flow in March 2004, following the events giving rise to this lawsuit. (Def.'s Trial Ex. 7.) It was his next big investment after Blue Rhino. (Trial Tr. at 511.)

151. Michel began researching I-Flow on March 9, 2004. (Pl.'s Trial Ex. 43; Trial Tr. at 392.) He did additional research on March 12, 13, 15, and 17. (Pl.'s Trial Ex. 43; Trial Tr. at 393-97.) He began buying I-Flow stock on March 24, 2004. (Trial Tr. at 397-98; Pl.'s Trial Ex. 27.)

152. Michel bought $26,477 of I-Flow in the first six trading days. (Pl.'s Trial Ex. 27.)

153. Michel continued acquiring I-Flow for 11 months, until February 2005, and acquired a total of $1.2 million in I-Flow stock for 40 client households. (Def.'s Trial Ex. 7; Trial Tr. at 398.)

154. Michel invested $250,958 of his own money in I-Flow, which is more than he

invested in Blue Rhino. (Def.'s Trial Ex. 6.)

155. Based on the evidence, the Court finds that Michel researched the stock for a longer period, he purchased the stock more slowly and over a longer period, and he invested less of his clients' money than he invested in Blue Rhino.

### *Tumbleweed*

156. Michel began investing in Tumbleweed stock in September 2004, following the events giving rise to this lawsuit. (Def.'s Trial Ex. 7.)

157. Michel invested $824,220 of his own money in Tumbleweed, which is more than he invested in Blue Rhino. (Def.'s Trial Ex. 6.)

158. Michel started researching Tumbleweed in May 2004. (Trial Tr. at 399; Pl.'s Trial Ex. 44.) The research Michel conducted on Tumbleweed included Standard & Poor's reports, a Yahoo Finance article, and an article from TheStreet.com. (Def.'s Trial Ex. 13.)

159. He first purchased Tumbleweed stock on September 28, 2004, approximately four months after he began his research. (Trial Tr. at 403; Pl.'s Trial Ex. 27.) In the first six trading days, Michel bought $646,135 of Tumbleweed. (Pl.'s Trial Ex. 27.) He continued buying it for more than a year, until October 2005, and in total purchased $2.2 million in Tumbleweed stock for 41 client households. (Trial Tr. at 403; Def.'s Trial Ex. 7.)

160. Based on the evidence, the Court finds that although Michel ultimately invested more in Tumbleweed than in Blue Rhino, he researched the stock for a longer period, and he purchased the stock more slowly and over a longer period than he did Blue Rhino.

### *Lexar Media*

161. Michel began purchasing Lexar Media stock in April 2005, following the events

giving rise to this lawsuit. (Def.'s Trial Ex. 7.)

162. Michel began researching Lexar Media in January 2005. (Trial Tr. at 404; Pl.'s Trial Ex. 45.) The research he conducted included a Yahoo Finance article and a Dorsey Wright & Associates chart. (Pl.'s Trial Ex. 45.)

163. Michel first purchased Lexar Media on April 28, 2005, approximately three months after he started his research. (Trial Tr. at 407.) In the first six trading days, Michel bought $498,836 of Lexar Media. (Pl.'s Trial Ex. 27.) He continued buying the stock up through February 2006, and purchased a total of $2.7 million for 45 client households. (Def.'s Trial Ex. 7; Trial Tr. at 407.)

164. Michel invested $697,055 of his own money in Lexar Media, which was more than he invested in Blue Rhino. (Def.'s Trial Ex. 6.)

165. Based on the evidence, the Court finds that although Michel ultimately invested more in Lexar Media, he researched the stock for a longer period, and he purchased the stock more slowly and over a longer period than he did Blue Rhino.

## Other Defense Evidence

166. Michel invested his brother Brian in Tumbleweed and Therasense on the first day he began investing in those stocks. (Def.'s Trial Ex. 8.) He invested Brian in I-Stat on the second day and I-Flow on the third day. (Def.'s Trial Ex. 8.) Brian invested less in Rhino than he invested in Tumbleweed, Lexar, and Therasense. (Def.'s Trial Ex. 6.)

167. Brian invested only $156,000 in Rhino, despite realizing a profit of over $291,000 and cashing out a total of $849,000 in proceeds from his Therasense investment a few weeks earlier. (Def.'s Trial Ex. 5, 6 & 8.)

168.     Brian had a net worth of over $4 million during this period, and had placed approximately $2 million in a money market account with Michel, which could have been used to purchase Blue Rhino stock. (Trial Tr. at 443-44.)

169.     Michel's mother Charlette invested more money in Therasense, Tumbleweed, and Lexar Media than she did in Blue Rhino. (Def.'s Trial Ex. 6.)

170.     Michel's father-in-law, David Kucera, and brother-in-law, Timothy Kucera, both invested in Blue Rhino. David Kucera invested approximately $50,000 in Therasense, compared with $14,000 in Rhino. Timothy Kucera invested $27,000 in Tumbleweed, compared with $18,000 in Rhino. (Def.'s Trial Ex. 6.)

171.     Michel invested a total of 40 customer households in Blue Rhino. He invested the same or more households in other investments: I-Flow (40), I-Stat (42), Tumbleweed (41), Therasense (53), and Lexar (45). (Def.'s Trial Ex. 7.)

172.     The Blue Rhino investments did not require Michel or his customers to use all of their liquid assets. (Trial Tr. at 477-81, 497.)

173.     Michel entered the Blue Rhino purchases for all of his customers as limit orders rather than market orders, which are filled more quickly. (Trial Tr. at 475-76, 630.)

174.     Only one of Michel's 40 customers who invested in Blue Rhino did not also invest in Therasense. Of the 39 customers that invested in both stocks, only 4 invested more in Rhino than they received in proceeds from Therasense. In addition, 25 of the 39 customers invested less in Blue Rhino than they did in Therasense. (Trial Tr. at 490-95; Def.'s Trial Ex. 5 & 6.)

175.     Tim Michel invested at least $1.6 million in Therasense on behalf of his

41

customers. (Def.'s Trial Ex. 9.)

## CONCLUSIONS OF LAW

176. Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in

connection with the purchase or sale of any security . . . any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15

U.S.C. § 78j(b). The purpose underlying Section 10(b) is to promote "the highest ethical

standards. . . in every facet of the securities industry." *SEC v. Capital Gains Research Bureau*,

375 U.S. 180, 186-187 (1963).

177. Pursuant to its statutory authority, the SEC has promulgated Rule 10b-5, which

provides:

> It shall be unlawful for any person, directly or indirectly, by the use of
> any means or instrumentality of interstate commerce, or of the mails or
> of any facility of any national securities exchange,
> (a) To employ any device scheme or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in light of
> the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates
> or would operate as a fraud or deceit upon any person, in connection
> with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

178. Trading on the basis of material, non-public information violates these sections

when the trading occurs in connection with the breach of a fiduciary duty. *Dirks v. SEC*, 463

U.S. 646, 663 (1983).

179. There are two theories for establishing liability for insider trading: (1) classical

theory, which involves trading by an insider who possesses a fiduciary duty to the corporation,

42

*see Dirks*, 463 U.S. at 660-61; and (2) misappropriation theory, which "extends the reach of Rule 10b-5 to outsiders who would not ordinarily be deemed fiduciaries of the corporate entities in whose stock they trade," *SEC v. Cherif*, 933 F.2d 403, 409 (7th Cir. 1991). The SEC is proceeding under the misappropriation theory in this case.

180.    Under the misappropriation theory, a corporate outsider and his tippees can be held liable for the misappropriation of material, non-public information from its lawful possessor. *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). When an outsider misappropriates confidential information from his source of the information, he is considered to be breaching a fiduciary duty owed to the source in violation of Rule 10b-5. *Id.*

181.    Therefore, for the Court to hold Michel liable under a misappropriation theory, the SEC must prove: the misappropriation of material, non-public information; in breach of a fiduciary duty; in connection with the purchase or sale of securities; and the requisite scienter, i.e., Michel knew or should have known that the information he traded on was misappropriated. *See Maio*, 51 F.3d at 631; *SEC v. Willis*, 777 F. Supp. 1165, 1169 (S.D.N.Y. 1991).

182.    The SEC has the burden of proving its allegations by a preponderance of the evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 (1983).

183.    The SEC is entitled to prove its case through circumstantial evidence. *Herman & MacLean*, 459 U.S. at 390 n. 30; *Maio*, 51 F.3d at 632-34; *SEC v. Van Wagner*, No. 97 C 6826, 1999 WL 691836 (N.D. Ill. Aug. 25, 1999); *SEC v. Saul*, No. 90 C 2633, 1991 WL 133738 (N.D. Ill. July 12, 1991).

## **Misappropriation**

184.    The overwhelming circumstantial evidence in this case shows: Roszak obtained

43

non-public information from Filipowski about Ferrellgas' potential acquisition of Blue Rhino; Roszak acted on that information on January 8 to buy an unusually large amount of Blue Rhino stock; Roszak on January 29 misappropriated additional non-public information about the daily board meetings, which suggested that the merger was imminent, and passed that information on to Edgecombe and others; Edgecombe, in turn, gave this same information to Michel and others; and Michel acted on that same information to buy large amounts of Blue Rhino stock in an unusually short period of time.

185.    In reaching this conclusion, the Court considers the equivocal testimony of Filipowski and Roszak about what they discussed during the January 8 flight, as well as their close professional relationship and their history of discussing confidential business information. *See Maio*, 51 F.3d at 627 (friendships of 15 plus years and business mentoring relationships among defendants was evidence supporting reasonable inference inside information was disclosed); *U.S. v. Larrabee*, 240 F.3d 18, 21-22 (1st Cir. 2001) (long-time friendship between corporate employee and broker helped establish inference of insider trading in criminal case); *SEC v. Musella*, 748 F. Supp. 1028, 1035-36 (S.D.N.Y. 1989) (noting 20-year friendship and fact that two defendants talked two to three times a week, and discussed stocks, as factors in conclusion that insider trading occurred), *aff'd*, 898 F.2d 138 (2d Cir. 1990).

186.    Indeed, Filipowski clearly trusted Roszak with confidential, sensitive business information. Although he could not recall giving Roszak any information about the merger on the January 8 flight, he acknowledged that he confided in Roszak about the merger with Ferrellgas two days before the public announcement because he wanted Roszak's advice on how the merger would affect the financial status of one of his other businesses. (Filipowski Invest.

44

Test. at 47-48.) He did not think to tell Roszak to keep this information or the information about the daily board meetings confidential because in his view Roszak was a "pro," meaning he knew "how to deal in publicly held situations and how to keep confidences." (Filipowski Invest. Test. at 136-37.) At another point, in reference to Roszak, Filipowski stated, "[Y]ou know, I'm under the supposition when you're in business with people that understand enough about securities and business that they act appropriately." (*Id.* at 51.)

187.    Equally important are the close relationships among the other individuals. Within 24 hours of receiving the email from Filipowski, Roszak called his brother, two brothers-in-law, and a long-time friend. That friend, Edgecombe, in turn called his brother and three close friends, including Michel. The evidence shows that these men routinely discussed stocks with each other.

188.    The evidence shows a sequence of communications in close proximity to each other—Roszak's time with Filipowski on January 8, his immediate trades thereafter, and the numerous telephone calls that occurred on January 29 and 30 within a day of Filipowski's e-mail— followed almost immediately by the unusually large purchases of Blue Rhino stock by every person involved. When the merger was announced less than two weeks later, the stock price went up approximately 20 percent. Shortly thereafter, the Defendants sold their stock for substantial profits. This "circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades" creates a compelling inference that insider trading occurred. *Larrabee*, 240 F.3d at 21; *see also SEC v. Warde*, 151 F.3d 42, 47-48 (2d Cir. 1998) (defendant's access to insider information, coupled with pattern of phone calls and stock purchases, provided sufficient evidence of insider trading to support jury verdict).

189. The Court also considers that Roszak, Edgecombe, Michel, and the other defendants and tippees provided shifting, contradictory, and implausible or inadequate explanations for their Blue Rhino trades. *See SEC v. Ginsburg*, 362 F.3d 1292, 1301 (11th Cir. 2004) (trading pattern in proximity to calls coupled with jury's right to disbelieve the defendant's explanations sufficient to support insider trading verdict against defendant); *SEC v. Sargent*, 229 F.3d 68, 74-75 (1st Cir. 2000) (jury could have reasonably inferred defendant possessed material, non-public information from timing and amount of trades and defendant's evasive explanation for stock purchases). Those in the direct line of communication to Michel—Roszak and Edgecombe—provided particularly unbelievable and evasive responses to questions about what they discussed during the myriad of phone calls that took place on January 29 and 30. These witnesses, as well as Michel, displayed highly selective memories, being able to recall details helpful to them while professing lack of memory of key conversations and other details, which the Court finds indicative that they were in possession of inside information.

190. The suspicious timing and amounts of the Blue Rhino purchases and the evasive testimony of Michel and the other witnesses gives rise to a reasonable inference that they possessed non-public information about the Blue Rhino-Ferrellgas merger, despite their self-serving denials that no insider information was disclosed. *See SEC v. Geon Indus., Inc.*, 531 F.2d 39 (2d Cir. 1976) (affirming district court's decision in favor of SEC following bench trial based on defendant's phone conversations with insider and immediate trades thereafter, even though insider asserted the Fifth Amendment privilege against self-incrimination and tippee claimed inability to recall the subject matter of their conversations); *SEC v. Ferrero*, 91 C 271, 1993 WL 625964 (S.D. Ind. Nov. 15, 1993) (finding in favor of SEC following bench trial based

46

on evidence of defendant's contact with insider and immediate trades thereafter, even though defendants denied giving or receiving tips), *aff'd sub nom. SEC v. Maio*, 51 F.3d 623 (7th Cir. 1995); *SEC v. Tome*, 638 F. Supp. 596 (S.D.N.Y. 1986) (finding in favor of SEC following bench trial where insider's memory of conversation with the defendant-tipper was "fuzzy," defendant-tipper asserted Fifth Amendment privilege, and defendant-tippee provided evasive testimony); *SEC v. Lum's, Inc.*, 365 F. Supp. 1046 (S.D.N.Y. 1973) (finding in favor of SEC following bench trial based on circumstantial evidence where defendants and other parties demonstrated "remarkably (and indeed, conveniently) hazy" memories of suspicious phone calls).

191.    Based on all the evidence, the Court concludes that Roszak misappropriated non-public information about the proposed merger and the daily board meetings, which was then misappropriated by Edgecombe, and finally was misappropriated by Michel.

### Materiality

192.    The Court must next determine whether the misappropriated information about the merger and the daily board meetings was material. Information is considered material if there is a substantial likelihood it would be significant to a reasonable investor in making his or her investment decisions. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). The determination of materiality requires "delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts and the significance of those inferences to him." *TSC Indus., Inc., v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

193.    The materiality of information with respect to contingent or speculative events depends "at any given time upon a balancing of both the indicated probability that the event will

47

occur and the anticipated magnitude of the event in light of the totality of company activity."
*Basic*, 485 U.S. at 238. Few matters are considered more material than a corporation's
involvement in a possible merger or acquisition. *Id.* at 236 (merger discussions significant to the
trading decision of a reasonable investor); *Maio*, 51 F.3d at 637 (information that meetings were
occurring relative to merger found to be material); *U.S. v. Mylett*, 97 F.3d 663, 667 (2d Cir.
1996) (merger was an event "of major magnitude" to reasonable investor).

194.    Here, the Court found that Roszak obtained information from Filipowski about
the proposed merger with Ferrellgas during the January 8 flight. There is also direct evidence in
the record of the January 28 email, which informed Roszak that Filipowski was currently
involved in daily Blue Rhino board meetings.[6] The Court finds that Roszak passed on the
information about the proposed merger and the daily board meetings to Edgecombe, who in turn
passed it on to Michel. Similar information about a proposed merger and the occurrence of daily
board meetings has been found to be material. *See Tome*, 638 F. Supp. at 623 (defendant's
knowledge that corporation was looking for a takeover target and that another company was the
only viable candidate, coupled with his subsequent knowledge that corporate insider was going
out of town to attend a board of director's meeting, suggesting takeover was imminent,
constituted material information).

195.    Also significant to the materiality analysis is the fact that Blue Rhino's stock price
increased by 20 percent when the merger was publicly announced. *See Mylett*, 97 F.3d at 667

---

[6] Michel argues that Roszak's specific knowledge of the merger process obtained from
his own personal experiences is irrelevant to the Court's consideration of materiality. We find
this argument specious, since our task is to determine whether the facts *known to Roszak* (and in
turn, his tippees) would be significant to a reasonable investor. *See Basic*, 485 U.S. at 231-32;
*TSC Indus.*, 426 U.S. at 450.

48

(jump in stock price following public merger announcement was indication that information about merger was material); *Tome*, 638 F. Supp. at 623 (immediate increase in stock price upon public announcement of tender offer indicates materiality of such information).

196.    Perhaps the best evidence of the materiality of the information comes from the conduct of the Defendants themselves. *See Maio*, 51 F.3d at 637 (trading patterns were themselves evidence of materiality); *SEC v. Shapiro*, 494 F.2d 1301, 1307 (2d Cir. 1974) (immediate trading upon receipt of insider information provides evidence of materiality). Hours after receiving Filipowski's email, Roszak initiated an extensive mosaic of almost 40 telephone calls among himself, Edgecombe, Michel, and seven others; the following day, all of these men made uncharacteristically large purchases of Blue Rhino stock.

197.    Also telling is the fact that some of the Defendants, including Michel, were aware of Blue Rhino as an investment opportunity prior to January 2004, but yet they chose not to invest in the stock. Their view of the stock changed dramatically following the series of phone calls that occurred on January 29, and, in Michel's case, led him to purchase $1.4 million of the stock over the course of the next six trading days. Based on the evidence, the Court concludes that there is a substantial likelihood that the information about the proposed merger and the daily board meetings, taken together, would be significant to a reasonable investor in making an investment decision.[7] *Basic*, 485 U.S. at 231-32. The Court thus finds this information material for purposes of the Exchange Act.

---

[7] Because the Court finds that the two pieces of information, taken together, constitute material information, Michel's lengthy discussion regarding the materiality of the email by itself is unavailing. (*See* R. 120, Def.'s Post-Trial Memo. at 2-10.)

## Breach Of Fiduciary Duty

198.    The Court must next determine whether Michel engaged in insider trading in breach of a fiduciary duty. Under the misappropriation theory, a tippee commits fraud if he "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *United States v. O'Hagan*, 521 U.S. 642, 652 (1997). Liability under the misappropriation theory is based on the notion that the outsider breaches a duty of loyalty and confidentiality to the person who shared the confidential relationship with him. *Id.* The misappropriation theory is designed to protect "the integrity of the securities markets against abuses by 'outsiders' to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders." *Id.* at 253. A tippee who obtains inside information has a derivative duty not to trade on that information. *Maio*, 51 F.3d at 632.

199.    As Filipowski's business partner and chief financial officer, with whom Filipowski regularly shared confidential business information, Roszak had a relationship of trust and confidence with Filipowski that created a duty not to misappropriate information Roszak learned from Filipowski about Blue Rhino. *SEC v. Yun*, 327 F.3d 1263, 1269 (11th Cir. 2003) (business relationships, such as attorney-client or employer-employee, provide the requisite duty of loyalty and confidentiality); *U.S. v. Carpenter*, 791 F.2d 1024, 1028 (2nd Cir. 1986) (employer-employee relationship created requisite duty of loyalty and confidentiality).

200.    Roszak knowingly violated his duty of loyalty and confidentiality to Filipowski on two occasions by using the material, non-public information about Blue Rhino merger negotiations to trade for himself and then later to tip his friends and relatives.

50

201. Once Edgecombe received material, non-public information from Roszak about the merger and the daily board meetings, he had a derivative duty not to trade on the information. Similarly, once Michel received material, non-public information from Edgecombe, he had a derivative duty not to trade on this information. The Court concludes that Edgecombe conveyed the same material, non-public information to Michel that he conveyed to the others; Edgecombe spoke to him at the same time as the others, immediately following his conversations with Roszak, and Michel acted the same was as the others—immediately purchasing large amounts of Blue Rhino. Michel and Edgecombe have offered self-serving and implausible testimony about what they discussed during their phone calls, but for reasons already discussed herein, the Court rejects this testimony.

202. When Michel bought Blue Rhino for himself and his customers based on the information he received from Edgecombe, he breached that derivative fiduciary duty, and thus committed fraud under Section 10(b) and Rule 10b-5.

## In Connection With The Purchase Or Sale Of Securities

203. The Court next considers whether the misappropriation occurred "in connection with the purchase or sale" of a security. 15 U.S.C. § 78j(b).

204. The "in connection with" requirement is satisfied here because Roszak's misappropriation of confidential information relating to the acquisition of Blue Rhino by Ferrellgas had no value except in connection with his subsequent purchase of Blue Rhino stock. *SEC v. Materia*, 745 F.2d 197, 203 (2nd Cir. 1984) (employee's misappropriation of non-public information was "in connection" with purchase of security since he took the information to gain profits in the stock market); *Tome*, 638 F. Supp. at 622 (corporate outsider's misappropriation of

51

non-public information about proposed takeover was "in connection" with purchase of security since his purpose was to "reap no-risk profits in the stock market."). For identical reasons, the "in connection with" requirement is satisfied for Michel, who bought Blue Rhino stock based on the misappropriated information that he received from Edgecombe in order to make profits for himself and his clients.

## Scienter

205.    Finally, the SEC must prove the requisite scienter, specifically, an intent to deceive, manipulate or defraud. *Aaron v. SEC*, 446 U.S. 680, 695-98 (1980); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976). The Court may infer scienter from the circumstantial evidence. *Herman & MacLean*, 459 U.S. at 391 n.30; *Michaels v. Michaels*, 767 F.2d 1185, 1199 (7th Cir. 1985).

206.    "[A] tippee has a derivative duty not to trade on material, non-public information when the disclosure of that information when the disclosure of the information is improper and the tippee knows or should know that this is the case." *Maio*, 51 F.3d at 632. Accordingly, for Michel to be held liable, the SEC must show that he knew or should have known that he was trading on the basis of non-public information that had been improperly disclosed.

207.    The Court concludes the SEC has adequately demonstrated scienter. We have considered numerous factors, including that during these events Michel had more than 10 years of experience as a licensed stockbroker, and was no doubt aware of insider trading laws, as well as the confidentiality of a proposed merger involving a publicly traded corporation. The Court also considers circumstantial evidence showing that Michel likely knew the source of the information was a Blue Rhino insider, namely, Filipowski. Such evidence includes the fact that

Michel obtained his information from Edgecombe, who had been friends with Roszak for many years; Edgecombe knew of Filipowski and knew that Roszak had worked for Filipowski; Edgecombe spoke on the phone several times with Jozwiak before speaking with Michel; Jozwiak, who is Roszak's brother-in-law, knew that Roszak worked for Filipowski; Michel had also heard of Filipowski; and part of Michel's research of Blue Rhino included an article that listed Filipowski as one of the company's insiders.

208. The Court also considers the evasive, conflicting, and implausible testimony of those in the direct line of communication with Michel, specifically, Roszak and Edgecombe, regarding what they discussed during the numerous phone calls that occurred on January 29. The Court also considers Michel's evasive testimony, his selective memory of events, along with the unlikely and implausible reasons he has offered for his Blue Rhino stock purchases.[8]

209. Finally, the Court considers Michel's actions with respect to Blue Rhino, specifically, the large purchases he made on behalf of himself, his relatives, and many clients beginning the morning after his phone calls from Edgecombe.

210. The Court concludes that the SEC has adequately demonstrated Michel knew or should have known that the disclosure of the merger and board meeting information was improper and nonetheless traded on this information.

211. Michel argues that his actions relative to Blue Rhino are not reflective of the type of urgency one would have if in possession of insider information. (R. 120, Def.'s Post-Trial

---

[8] The Court finds this case distinguishable from *SEC v. Moran*, 922 F. Supp. 867 (S.D.N.Y. 1996), relied on by Michel, because there the court found ample objective evidence to support the innocent explanations offered by the defendant for his stock purchases. For the reasons already discussed herein, this Court does not find Michel's innocent explanations credible.

Memo. at 13-15.) This Court disagrees. The evidence shows that the morning after speaking with Edgecombe, at 9:09 a.m., Michel began making his purchases of Blue Rhino stock. Although he did not purchase any Blue Rhino stock for himself that day, he sold some stock he owned in another company that same day, and on the next business day began purchasing Blue Rhino stock for himself. He thereafter sought a substantial loan from his brother, his largest ever, for the express purchase of buying more Blue Rhino stock. In light of the overall timeline of events, the Court does not find it significant that Michel waited one day to purchase stock for himself, or that he had the loan proceeds from his brother in his account for at least a day before using the money to purchase more Blue Rhino stock, since it is undisputed that during this time Michel was buying the stock for numerous clients, including his mother and other relatives. Although there is evidence Michel and his clients could have acquired more Blue Rhino stock even quicker than they did, the Court does not attribute this to any lack of urgency on Michel's part, but, more likely, to the fact that as an experienced stockbroker Michel was no doubt aware of the undue attention that would be drawn if he were to proceed too hastily.

212.    Michel also argues that his Blue Rhino purchases were in no way unusual, pointing to other stock purchases he made both before and after his Blue Rhino trades. As Michel points out, the Seventh Circuit has held that an inference of insider trading may be negated by evidence that the stock trades in question were consistent in timing and amount with past investments in the same corporate stock. *See Freeman v. Decio*, 584 F.2d 186, 197 & n. 44 (7th Cir. 1978); *SEC v. Heartland Advisors, Inc.*, No. 03-C-1427, 2006 WL 2547090 (E.D. Wis. Aug. 31, 2006) (applying *Freeman*).

213.    Here, Michel has not shown a similarity of trading patterns with respect to past

54

investments in Blue Rhino. Instead, he has attempted to show a similarity between his Blue Rhino stock trades and his investment in *other* corporate stocks, both before and after his investment in Blue Rhino. This evidence is far less probative than the evidence relied on by the court in *Freeman*, which involved past sales of the same corporate stock. As Michel himself explained at trial, there are numerous factors that influence trading decisions at any given time, including the overall strength of the market, information in the public domain about a particular company, and the amount of money available to the investor. (*See* Trial Tr. at 437-38, 447-48, 498-501.) Because of the myriad factors that go into any one investment decision, it is somewhat difficult to draw parallels between Michel's investment in Blue Rhino and his investment in other corporate stocks over the course of several years. Additionally, the Court finds the investments Michel made after Blue Rhino of very limited relevance, since Michel could have altered his post-Blue Rhino trading behavior in an effort to obscure the fact that he traded on the basis of insider information.

214.    Nevertheless, giving consideration to these other investments, the Court concludes that they are not similar enough to Michel's trading in Blue Rhino to negate the evidence of insider trading. Michel researched five of the six other stocks for at least days, weeks, or months before making a purchase, and he purchased them more slowly and over a longer period. Even assuming Michel purchased Therasense the same day he started researching the stock (a point on which the evidence is equivocal at best), he purchased the stock more slowly and over a longer period than Blue Rhino. Similarly, even assuming Michel purchased Electroglas the same day he began researching the stock, he bought the stock for only a few households.

215.    The evidence regarding Tim Michel's investments, and his motivations for

55

making these purchases, is even further attenuated from the issue of whether Michel traded on inside information. Further, Tim's decision to purchase large amounts of Blue Rhino stock was likely influenced by Michel's own enthusiasm for the stock, which, we have found, was based on his knowledge of inside information. The Court thus finds the evidence of Tim Michel's purchases insufficient to negate the evidence that Michel knowingly traded on inside information.

216. For all of these reasons, the Court concludes that Michel violated Section 10(b) of the Exchange Act and Rule 10b-5 by trading on the basis of material, non-public information in breach of fiduciary duty, in connection with the purchase or sale of securities, and with the requisite scienter.

## Permanent Injunctive Relief

217. Pursuant to Section 21(d)(1) of the Exchange Act, 15 U.S.C. §78u(d)(1), the Court has the authority and discretion to enter a permanent injunction against future violations of the federal securities laws once the SEC has proven a violation of those laws.

218. To obtain a permanent injunction "once a violation is demonstrated, the moving party need only show that there is some reasonable likelihood of future violations." *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982). The Court considers the following factors in determining the need for an injunction: (1) the gravity of harm caused by the offense; (2) the extent of the defendant's participation and degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability; and (5) the sincerity of any assurances against future violations. *Id.; SEC v. Randy*, 38 F. Supp. 2d 657,

56

672 (N.D. Ill. 1999).

219. Applying these factors here, the Court concludes that the SEC is entitled to permanent injunctive relief against Michel.

220. First, insider trading causes harm to the credibility of the public markets. As the Supreme Court has recognized, "Investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law." *O'Hagan*, 521 U.S. at 658.

221. Second and third, Michel was an extensive participant in the insider trading. Immediately upon receiving the tip from Edgecombe, he set about buying $1.4 million worth of Blue Rhino in just six trading days, far more than any of the other Defendants. His numerous purchases of Blue Rhino stock on behalf of 40 customer households, including several relatives, demonstrates that this was not an isolated infraction. Michel also continues to work as a securities broker today, and will continue to have the opportunity to violate the law again.

222. Fourth and fifth, Michel has never admitted any wrongful behavior. Instead, he came before this Court and offered equivocal and evasive testimony, claiming lack of memory of various facts and events, which in many instances strained credulity, and insisting that he did nothing wrong. At no point in these proceedings has Michel recognized his culpability or offered any assurances that he will not commit future securities violations. *See SEC v. Lipson*, 278 F.3d 656, 664 (7th Cir. 2002) ("The criminal who in the teeth of the evidence insists that he is innocent . . . demonstrates by his obduracy the likelihood that he will repeat his crime . . . .")

223. For these reasons, the Court will enter a permanent injunction enjoining Michel from future violations of Section 10(b) of the Exchange Act and Rule 10b-5.

## Disgorgement

224.  Disgorgement is designed both to deprive a wrongdoer of unjust enrichment and deter others from violating the securities laws. *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989). The Court has broad discretion not only in determining whether to order disgorgement but also in calculating the amount to be disgorged. *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1474-75 (2nd Cir. 1996). The remedy of disgorgement may not be used punitively. *First City*, 890 F.2d at 1231.

225.  The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *First City*, 890 F.2d at 1231. A showing of "the actual profits on the tainted transactions" presumptively satisfies the SEC's burden of approximating the disgorgement amount. *Id.* at 1232.

226.  A tipper can be required to disgorge his tippees' profits, even if the tippees themselves have not been found to have violated securities laws. *SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990). Holding a person liable for knowingly using illegal insider information to benefit others is a necessary deterrent to the evasion of Rule 10b-5. *Id.* at 454; *see also Tome*, 638 F. Supp. at 617 n. 40 (tipper is liable for profits obtained from tippee's trades even if tippee himself could not be held liable for insider trading); *SEC v. Sekhri*, No. 98 cv 2320, 2002 WL 31100823, at *17 (S.D.N.Y. July 22, 2002) (holding broker liable for disgorgement of clients' profits generated through broker's use of inside information).

227.  Here, the Commission has satisfied its burden of reasonably approximating disgorgement by showing the profits Michel made for himself and his customers and the commissions he made on the Blue Rhino trades that were based on insider information. The

evidence shows Michel made $31,981 in profits on his Blue Rhino investment, and his customers made $234,470 in profits. In addition, the evidence shows Michel received $11,430 in commissions for his Blue Rhino trades.

228.    Thus, Michel's total profits from the illegal trading were $277,881, and the Court orders him to disgorge that amount.

229.    The SEC also seeks an award of prejudgment interest on the disgorgement amount. The decision to award prejudgment interest rests in the sound discretion of the Court. *Michaels*, 767 F.2d at 1204. In an SEC enforcement action, a disgorgement order should include all gains flowing from the illegal conduct, including prejudgment interest, to ensure that the wrongdoer does not make any illicit profits. *Randy*, 38 F. Supp. 2d at 674; *see also Moran*, 944 F. Supp. at 295 ("Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity."). Accordingly, the Court orders Michel to pay prejudgment interest.

230.    The Court has calculated pre-judgment interest in accordance with the delinquent tax rate as established by the Internal Revenue Service, Internal Revenue Code § 6621(a)(2), and assessed on a quarterly basis from June 1, 2004 through October 1, 2007. Based on the principal amount of $277,881, the Court orders Michel to pay prejudgment interest of $68,307, for a total of $346,188.

## Civil Penalty

231.    The Commission seeks a civil penalty against Michel pursuant to Section 21A of the Exchange Act, but has not proposed a specific amount.

232.    The Court reserves jurisdiction to set an appropriate civil penalty, and orders the

Commission to file its motion seeking a specific penalty amount within fourteen (14) days of the date of this Order.

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.     IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Final Judgment is entered in favor of the Securities Exchange Commission and against Defendant Mark Michel;

2.     IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant Mark Michel and his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, by using any means or instrumentality of interstate commerce, or the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    a.     to employ any device, scheme, or artifice to defraud;

    b.     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

3.     IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant Mark Michel is liable for disgorgement of $277,881, representing profits gained as a result of conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of

$68,307, for a total of $346,188.

4.    The Court reserves jurisdiction to set an appropriate civil penalty pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1, and orders the Commission to file its motion seeking a specific penalty amount within fourteen (14) days of the date of this Order.

ENTERED: _____

Judge Ruben Castillo
United States District Court

Dated:  November 26, 2007